**COMMON CAUSE/GEORGIA, League of Women Voters of Georgia, Inc., The Central Presbyterian Outreach and Advocacy Center, Inc., Georgia Association of Black Elected Officials, Inc., The National Association for the Advancement of Colored People (NAACP), through its Georgia State Conference of Branches, Georgia Legislative Black Caucus, Concerned Black Clergy of Metropolitan Atlanta, Inc., Bertha B. Young, and Eugene Taylor, Plaintiffs,**

v.

**Evon BILLUPS, Superintendent of Elections for the Board of Elections and Voter Registration for Floyd County and the City of Rome, Georgia, Tracy Brown, Superintendent of Elections of Bartow County, Georgia, Gary Petty, Michelle Hudson, Amanda Spencer, Ron McKelvey, and Nina Crawford, Members of the Board of Elections and Registration of Catoosa County, Georgia, Judge John Payne, Superintendent of Elections of Chat-**

tooga County, Georgia, Shea Hicks, Superintendent of Elections for Gordon County, Georgia, Jennifer A. Johnson, Superintendent of Elections for Polk County, Georgia, Individually and in their Respective Official Capacities as Superintendents or Members of the Elections Board in their Individual Counties, and as Class Representatives, and Karen Handel, individually and in her official capacities as Secretary of State of Georgia and Chair of the Georgia Elections Board, Defendants,

and

The State Election Board, Intervenor–Defendant.

Civil Action File No. 4:05–CV–0201–HLM.

United States District Court, N.D. Georgia, Rome Division.

Sept. 6, 2007.

David G.H. Brackett, Emmet J. Bondurant, II, Jason James Carter, Bondurant Mixson & Elmore, Elizabeth Lynn Littrell, Gerald R. Weber, Margaret Fletcher Garrett, American Civil Liberties Union Foundation of Georgia, Inc, Meredith Bell–Platts, Moffatt Laughlin McDonald, Neil T. Bradley, American Civil Liberties Union Foundation Southern Regional Office, Miles J. Alexander, Seth Aaron Cohen, Lauren T. Estrin, Kilpatrick Stockton, Ralph Irving Knowles, Jr., Doffermyre Shields Canfield Knowles & Devine, Tisha

Rae Tallman, Mexican American Legal Defense & Educational Fund, Atlanta, GA, Edward Hine, Jr., Office of Edward Hine, Jr., Rome, GA, Jon M. Greenbaum, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Plaintiffs.

Michael D. McRae, Smith Shaw & Maddox, Brad J. McFall, Gammon & Anderson, Cedartown, GA, Thomas Hunter Manning, Smith Shaw & Maddox, Rome, GA, Peter R. Olson, Jenkins & Olson, Cartersville, GA, Clifton M. Patty, Jr., Office of Clifton M. Patty, Jr., Ringgold, GA, Christopher Lee Corbin, Farrar & Corbin, P.C., Summerville, GA, Martha Suzanne Hutchinson, Calhoun, GA, Robert Harris Smalley, III, McCamy Phillips Tuggle & Fordham, Dalton, GA, Anne Ware Lewis, Strickland Brockington Lewis, Mark Howard Cohen, Troutman Sanders, Stefan Ernst Ritter, Office of State Attorney General, Atlanta, GA, for Defendants.

## ORDER

MURPHY, District Judge.

This case is an action to have the photo identification ("Photo ID") requirement set forth in Senate Bill 84 ("The 2006 Photo ID Act") declared unconstitutional both on its face and as applied, and to enjoin its enforcement on the ground that it imposes an unauthorized, unnecessary, and undue burden on the fundamental right to vote of hundreds of thousands of registered Georgia voters, in violation of the Fourteenth and Twenty–Fourth Amendments to the federal Constitution, the Civil Rights Act of 1964 (42 U.S.C.A. § 1971(a)(2)(A) and (a)(2)(B)), and Section 2 of the Voting Rights Act of 1965 (42 U.S.C.A. § 1973(a)). The case came before the Court on August 22 through August 24, 2007, for a bench trial on Plaintiffs' request for a permanent injunction. This Order first sets forth the procedural background for the case, and then sets forth the Court's findings of fact

and conclusions of law from the bench trial.

At the outset, the Court commends counsel on both sides of this case for their courteousness and professionalism. Counsel worked diligently to prepare this case for trial within a very short time frame, and managed to complete discovery in an equally short time frame with only minimal intervention by the Court. Counsel's preparation, diligence, competence, and professionalism all made the litigation of this case much easier for the Court and the parties.

## I. Procedural Background

1. On September 1, 2005, Plaintiffs filed this lawsuit. (Docket Entry No. 1.) Plaintiffs initially asserted that the Photo ID requirement in the 2005 Amendment to O.C.G.A. § 21-2-417 (Act. No. 53) ("The 2005 Photo ID Act") violated the federal and Georgia constitutions, was a poll tax that violated the Twenty–Fourth Amendment and the Equal Protection Clause, unduly burdened the fundamental right to vote, violated the Civil Rights Act of 1964, and violated Section 2 of the Voting Rights Act of 1965.

2. On September 19, 2005, Plaintiffs requested that the Court schedule a preliminary injunction hearing.

3. On that same day, the Court entered an Order scheduling a preliminary injunction hearing for October 12, 2005. (Order of Sept. 19, 2005.)

4. On October 6, 2005, Plaintiffs filed a formal Motion for Preliminary Injunction.

5. On October 7, 2005, former Secretary of State Cathy Cox and the State Election Board (the "State Defendants") filed a Motion to Dismiss Individual Capacity Claims.

6. On October 11, 2005, individual Plaintiff Tony Watkins filed a Stipulation

of Dismissal Without Prejudice of his claims.

7. On October 12, 2005, Plaintiffs filed their First Amendment to Complaint, which addressed the issue of standing for the organizational Plaintiffs.

8. On October 12, 2005, the Court held a hearing with respect to Plaintiffs' Motion for Preliminary Injunction. (Oct. 12, 2005, Hr'g Tr.) During the October 12, 2005, hearing, the parties presented evidence and arguments in support of their respective positions. (Id.)

9. On October 18, 2005, the Court entered an Order granting Plaintiffs' Motion for Preliminary Injunction and finding that Plaintiffs had a substantial likelihood of success on their claims that the 2005 Photo ID Act unduly burdened the right to vote, and that the 2005 Photo ID Act constituted a poll tax. (Order of Oct. 18, 2005.)

10. On October 19, 2005, the Court denied the State Defendants' Motion to Dismiss Individual Capacity Claims. (Order of Oct. 19, 2005.)

11. On October 20, 2005, the Court denied the State Defendants' Motion to Stay Preliminary Injunction Pending Appeal. (Order of Oct. 20, 2005.)

12. The State Defendants appealed the October 18, 2005, Order to the United States Court of Appeals for the Eleventh Circuit, requesting that the Eleventh Circuit stay the Court's October 18, 2005, Order pending resolution of the appeal.

13. On October 27, 2005, the Eleventh Circuit denied the State Defendants' Motion to Stay the October 18, 2005, Order pending resolution of the appeal.

14. In January 2006, the Georgia General Assembly passed the 2006 Photo ID Act, which Governor Purdue signed into law.

15. On February 23, 2006, Plaintiffs filed a Motion for Leave to File Second Amended Complaint. In that Motion, Plaintiffs sought permission to amend their First Amended to Complaint to assert claims that both the 2005 Photo ID Act and the 2006 Photo ID Act violated the Georgia Constitution, the federal Equal Protection Clause, the Fourteenth and Twenty–Fourth Amendments to the federal Constitution, the Civil Rights Act of 1964, and Section 2 of the Voting Rights Act of 1965.

16. On March 2, 2006, the Court held a telephone conference with counsel to discuss the issues relating to preclearance of the 2006 Photo ID Act by the United States Department of Justice ("DOJ"). The Court stayed the proceedings in this case pending notification of the DOJ's decision concerning preclearance of the 2006 Photo ID Act. (Order of Mar. 2, 2006.)

17. On April 21, 2006, former Secretary of State Cox filed a Notice of Section 5 Preclearance of Act 432 (SB 84).

18. On that same day, the Court entered an Order lifting the stay in this case, and setting forth a briefing schedule for Plaintiffs' Second Motion for Preliminary Injunction. (Order of Apr. 21, 2006.)

19. On April 26, 2006, Plaintiffs filed their Second Amended Complaint.

20. On May 5, 2006, Plaintiffs filed a Motion to Revise Scheduling Order of April 21, 2006, pending the State Election Board's adoption of rules and regulations implementing the 2006 Photo ID Act, and pending DOJ preclearance of those rules and regulations.

21. On that same day, the Court approved a Consent Order revising the briefing schedule for Plaintiffs' Second Motion for Preliminary Injunction to require Plaintiffs to file that Motion within ten days after the rules and regulations adopted by the State Election Board received preclearance from the DOJ. (Order of May 5, 2006.)

22. On May 10, 2006, former Secretary of State Cox and the State Election Board filed a Motion to Dismiss Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief in Part.

23. On May 25, 2006, Plaintiffs filed a Second Motion for Order to Certify Questions of State Law to the Georgia Supreme Court.

24. On June 29, 2006, the Court entered an Order granting the Motion to Dismiss Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief in Part, dismissing Counts One and Three of Plaintiffs' Second Amended Complaint, as well as the portions of Counts Two, Five, and Six of Plaintiffs' Second Amended Complaint that challenged the 2005 Photo ID Act. (Order of June 29, 2006.) In that same Order, the Court denied Plaintiffs' Second Motion for Order to Certify Questions of State Law to the Georgia Supreme Court. (*Id.*)

25. After the Court's June 29, 2006, Order, the following claims asserted in Plaintiffs' Second Amended Complaint remained pending. In Count Two of their Second Amended Complaint, Plaintiffs contended that the Photo ID requirement imposes an undue burden on the right to vote, in violation of the Equal Protection Clause. (Second Am. Compl. ¶¶ 89–91.) In Count Four of their Second Amended Complaint, Plaintiffs asserted that the 2006 Photo ID Act is an unconstitutional poll tax if it is construed or applied to require voters to pay a fee for a birth certificate or other documents to obtain a Georgia voter Photo ID card. (*Id.* ¶¶ 96–97.) In Count Five of their Second Amended Complaint, Plaintiffs alleged that the Photo ID requirement violates the Civil Right Act of 1964, as set forth in 42 U.S.C.A. §§ 1971(a)(2)(A) and 1971(a)(2)(B). (*Id.* ¶¶ 98–102.) Finally, in Count Six of their Second Amended Complaint, Plaintiffs asserted that the Photo ID requirement violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973(a). (*Id.* ¶¶ 103–106.)

26. On July 5, 2006, Plaintiffs filed their Second Motion for Preliminary Injunction. Plaintiffs sought to have the 2006 Photo ID Act declared invalid, both on its face and as applied, and to enjoin its enforcement. Plaintiffs contended that the 2006 Photo ID Act imposes an unauthorized, unnecessary, and undue burden on the fundamental right to vote of hundreds of thousands of registered Georgia voters, in violation of article II, section I, paragraph 2 of the Georgia Constitution, the Fourteenth and Twenty–Fourth Amendments to the United States Constitution, the Civil Rights Act of 1964 (42 U.S.C.A. §§ 1971(a)(2)(A) and (a)(2)(B)), Section 2 of the Voting Rights Act of 1965 (42 U.S.C.A. § 1973(a)), and 42 U.S.C.A. §§ 1983 and 1988. Plaintiffs requested that the Court enter a preliminary injunction that prohibits Defendants from: (1) enforcing or attempting to enforce or apply the 2006 Photo ID Act and the regulations issued by the State Election Board under that Act at any elections in Georgia; or (2) discouraging, interfering with, or preventing any person who is lawfully registered from voting in person in any such elections, pending a final trial on the merits or a further Order from the Court. Plaintiffs requested that the Court enjoin Defendants "and [that] all state or local election officials be further enjoined from making any public announcement or statements or other communications that advise registered voters or election officials in Georgia that registered voters may not cast a ballot in any election if the voter does not have one of the forms of photo identification specified in the 2006 Photo ID Act." (Pls.' Mot. Second Prelim. Inj. at 2.) Plaintiffs also asked the Court to order and direct Defendants "to send prompt written notice to each of the 675,000 regis-

tered voters who have been identified by the Secretary of State as not having Georgia driver's licenses, informing them that they are not required to present photographic identification as a condition to being admitted to the polls or allowed to vote and that they will not be discouraged, interfered with, or otherwise prevented from voting in person by defendants or other election officials on the ground that they are unable to present photographic identification to election officials at the polls." (*Id.* at 2–3.)

27. On July 7, 2006, the State Election Board filed a Motion to Dismiss Plaintiffs' Second Motion for Preliminary Injunction and to Cancel Hearing. That Motion to Dismiss followed a temporary restraining order issued by the Superior Court of Fulton County, Georgia, on July 7, 2006, enjoining the defendants in that case from enforcing the 2006 Photo ID Act during the July 18, 2006, primary election or any resulting run-off election. *Lake v. Perdue*, Civil Action File No.2006CV119207, slip op. at 3–4 (Fulton County Super. Ct. July 7, 2006.) The plaintiffs in *Lake* had argued that the 2006 Photo ID Act violated the Georgia Constitution.

28. On July 10, 2006, following a telephone conference with counsel, the Court entered an Order indicating that the Court would postpone the July 12, 2006, preliminary injunction hearing in this case if the Supreme Court of Georgia entered an Order denying the *Lake* defendants' request to stay the temporary restraining order in that case prior to July 12, 2006. (Order of July 12, 2006.)

29. On July 12, 2006, the Court held a hearing concerning Plaintiffs' Second Motion for Preliminary Injunction. (July 12, 2006, Hr'g Tr.) Near the conclusion of the hearing, counsel received information that the Georgia Supreme Court had denied the *Lake* defendants' request to stay the temporary restraining order in that case,

leaving the temporary restraining order in place for at least thirty days. (*Id.*)

30. At the conclusion of the July 12, 2006, hearing, the Court orally granted Plaintiffs' Second Motion for Preliminary Injunction with respect to Plaintiffs' claim under the Equal Protection Clause. (July 12, 2006, Hr'g Tr.) On July 14, 2006, the Court entered a written Order that formally set forth the Court's findings and conclusions concerning Plaintiffs' Second Motion for Preliminary Injunction. (Order of July 14, 2006.) The Court granted Plaintiffs' Second Motion for Preliminary Injunction solely with respect to the July 2006 primary elections and associated run-offs, reasoning that 2006 Photo ID Act posed an undue burden on certain voters with respect to those elections. (*Id.*) The Court declined to extend the preliminary injunction to cover subsequent elections, reasoning that if the State Defendants continued their education efforts with respect to the 2006 Photo ID Act, the requirements of that Act might no longer prove unduly burdensome for voters in subsequent elections. (*Id.*)

31. After the Court's July 14, 2006, Order, and after the Georgia Supreme Court's refusal to stay the temporary restraining order issued in the *Lake* case, the State Defendants stopped all of their attempts to educate voters concerning the 2006 Photo ID Act. In early September 2006, the State Election Board voted to resume those educational efforts.

32. On September 5, 2006, the Court held a telephone conference with the parties to address Plaintiffs' concerns with respect to the educational efforts and the application of the 2006 Photo ID Act to the September 2006 special elections.

33. On September 6, 2006, Plaintiffs filed their Motion for Hearing on Plaintiffs' Second Motion for Preliminary In-

junction in Advance of the September 2006 special elections.

34. On September 14, 2006, the Court held its third preliminary injunction hearing in this case. (Sept. 14, 2006, Hr'g Tr.) At the conclusion of the September 14, 2006, hearing, the Court verbally granted Plaintiffs' request for a preliminary injunction with respect to the September 2006 special elections. (*Id.*)

35. On September 26, 2006, the State Defendants filed a Motion to Stay Proceedings Pending Resolution of Appeal of the Superior Court of Fulton County's Declaratory Judgment and Permanent Injunction to the Georgia Supreme Court. (Docket Entry No. 144.) On September 28, 2006, the Court granted that Motion. (Order of Sept. 28, 2006.)

36. On June 11, 2007, the Georgia Supreme Court issued its decision in *Perdue v. Lake,* 647 S.E.2d 6 (Ga.2007). In that decision, the Georgia Supreme Court concluded that the plaintiff in *Lake* lacked standing because she possessed a MARTA card that was acceptable for in-person voting under the 2006 Photo ID Act, and vacated the Fulton County Superior Court's determination that the 2006 Photo ID Act violated the Georgia Constitution. *Lake,* 647 S.E.2d at 8. On July 27, 2007, the Georgia Supreme Court denied a request for reconsideration by the plaintiff. (Docket Entry No. 151–3.)

37. On July 27, 2007, the State Defendants filed a Motion for Order Lifting Stay of Proceedings and Setting Trial on Merits. (Docket Entry No. 151.) On August 1, 2007, the Court granted that Motion. (Order of Aug. 1, 2007.)

38. On August 2, 2007, the Court entered an Order directing the parties and their counsel to appear before the Court on August 22, 2007, for a final trial on the merits. (Order of Aug. 2, 2007.)

39. On August 13, 2007, Plaintiffs filed a Motion for Leave to Amend to Add Plaintiffs and to Reflect the Substitution of a Defendant. (Docket Entry No. 159.) Plaintiffs sought to amend their Second Amended Complaint to add new individual plaintiffs in light of the Georgia Supreme Court's finding that a MARTA card is an acceptable form of Photo ID for purposes of the 2006 Photo ID Act, the lone individual Plaintiff, Clara Williams, lacked standing to pursue this action because she had a MARTA card. (*Id.*) Plaintiffs also sought to substitute the current Georgia Secretary of State, Karen Handel, for the former Georgia Secretary of State, Cathy Cox. (*Id.*)

40. On August 14, 2007, the State Defendants filed a Motion to Dismiss Plaintiff Clara Williams for Lack of Standing. (Docket Entry No. 166.)

41. On August 16, 2007, counsel for Plaintiffs filed a new lawsuit challenging the 2006 Photo ID Act. *Young v. Billups,* Civil Action File No. 4:07–CV–0163–HLM. Plaintiffs sought to add the named plaintiffs in the *Young* case as individual Plaintiffs in this lawsuit. On August 17, 2007, the *Young* Plaintiffs filed an Emergency Motion to Consolidate the *Young* case with the instant case.

42. On August 17, 2007, the Court entered an Order granting Plaintiffs' Motion for Leave to Amend, and allowed Plaintiffs to add Bertha B. Young and Eugene Taylor as individual Plaintiffs and to substitute current Secretary of State Karen Handel for former Secretary of State Cox. (Order of Aug. 17, 2007.) The Court denied as moot the Emergency Motion to Consolidate the *Young* case with this one. (*Id.*) On that same day, the Court granted the State Defendants' Motion to Dismiss Plaintiff Clara Williams for Lack of Standing, and dismissed Plaintiff Williams from this suit. (*Id.*)

43. On August 22, 2007, the case proceeded to a bench trial. The bench trial concluded on August 24, 2007. During the bench trial, the Court orally granted the State Defendant's Motion for a Directed Verdict, and dismissed six organizational Plaintiffs, including Common Cause/Georgia, the League of Women Voters of Georgia, Inc., The Central Presbyterian Outreach and Advocacy Center, Inc., the Georgia Association of Black Elected Officials, Inc., the Georgia Legislative Black Caucus, and Concerned Black Clergy of Metropolitan Atlanta, Inc., for lack of standing. The Court denied the Motion with respect to Plaintiffs Young and Taylor and Plaintiff NAACP, but indicated that it would reconsider the question of standing after the conclusion of the trial.

44. During the bench trial, Plaintiffs proceeded forward only on their claim that the 2006 Photo ID Act unduly burdens their right to vote, in violation of their equal protection rights. This Order therefore addresses only that claim and the question of standing.

## II. Findings of Fact

### A. History of the 2006 Photo ID Act

1. Prior to the 1998 elections, voters in Georgia, like registered voters in a majority of other states, were not required to present identification as a condition of voting. In 1997, the Georgia General Assembly adopted O.C.G.A. § 21–2–417, which required registered voters in Georgia to identify themselves by presenting one of seventeen forms of identification to election officials as a condition of being admitted to the polls and of being allowed to vote. Prior to its amendment in 1997, O.C.G.A. § 21–2–417 permitted, but did not require, registered voters to present a Georgia driver's license or other form of official photographic identification as a method of identification as a condition of voting. Under the version of O.C.G.A.

§ 21–2–417 as amended in 1997, voters remained free to use any of eight other methods of identification for voting, including a birth certificate, a social security card, a copy of a current utility bill, a government check, a payroll check, or a bank statement showing the voter's name and address. Additionally, voters who did not have, or could not find, one of the seventeen forms of identification specified in former O.C.G.A. § 21–2–417(a), were entitled to be admitted to the polls, to be issued a ballot, and to be allowed to vote simply by signing a statement under oath swearing or affirming that he or she is the person identified on the elector's certificate.

2. In 2005, the Georgia General Assembly adopted House Bill 244, or Act 53 ("HB 244"), which amended O.C.G.A. § 21–2–417 to require that all registered voters in Georgia who vote in person in all primary, special, or general elections for state, national, and local offices held on or after July 1, 2005, present a government-issued Photo ID to election officials as a condition of being admitted to the polls and before being issued a ballot and being allowed to vote. The Georgia House of Representatives approved the Conference Committee Report on Act 53. Eighty-nine Republicans and two Democrats voted for HB 244, while seventy-two Democrats and three Republicans voted against it. The Georgia Senate adopted the Conference Committee Report on Act 53, with thirty-one Republicans and no Democrats voting in favor of it and eighteen Democrats and two Republicans voting against it. (*Id.*)

3. On April 22, 2005, Governor Sonny Perdue signed HB 244, and the Photo ID requirement of HB 244 became effective on July 1, 2005, subject to pre-clearance by the United States Department of Justice. The Photo ID requirement of HB 244 was codified in O.C.G.A. § 21–2–417. HB 244

also eliminated the requirement that voters seeking to vote via absentee ballot by mail provide one of several statutory excuses in order to obtain an absentee ballot.

4. In January 2006, a majority of legislators in the Georgia House of Representatives and the Georgia Senate adopted the 2006 Photo ID Act. The 2006 Photo ID Act repealed the 2005 Photo ID Amendment, replacing it with identical Photo ID requirements for in-person voting and a new code section, O.C.G.A. § 21–2–417.1, which requires the Board of Elections in each county to issue a "Georgia voter identification card" containing a photograph of the voter, without charge to voters residing in the county, upon presentation of certain identifying documents. The 2006 Photo ID Act amended O.C.G.A. § 40–5–103 by striking the previous subsection (d) in the 2005 Photo ID Act, which had required a voter to execute an affidavit of poverty to obtain a Photo ID without charge from the Department of Drivers Services ("DDS"). In its place, the 2006 Act substituted a requirement that the voter swear "that he or she desires an identification card in order to vote ... and that he or she does not have any other form of identification that is acceptable under Code § 21–2–417" and to "produce evidence that he or she is registered to vote in Georgia."

5. On January 9, 2006, the first day of the 2006 legislative session, the House Committee on Governmental Affairs of the Georgia House of Representatives approved SB 84 by a straight party-line vote of seven to three, sending the bill to the floor of the House.

6. On January 24, 2006, the Senate passed SB 84 by a vote of thirty-two to twenty-two, with two members excused. Thirty-two Republicans voted in favor of it, and twenty-one Democrats and one Republican voted against it. On January 25, 2006, the House of Representatives passed SB 84 by a vote of 111 to sixty, with three members excused. Ninety-eight Republicans and thirteen Democrats voted in favor of it, while sixty Democrats voted against it. On January 26, 2006, Georgia's Governor, Sonny Perdue, signed the Act. The Georgia General Assembly refused to delay the effective date of the 2006 Photo ID Act until after the 2006 primary and general elections. On April 21, 2006, the DOJ precleared the 2006 Photo ID Act.

7. The 2006 Photo ID Act changed O.C.G.A. § 40–5–103(d)(1) to eliminate the affidavit of indigency requirement. That portion of the statute now provides:

> The department shall not be authorized to collect a fee for an identification card from any person:

> (1) Who swears under oath that he or she desires an identification card in order to vote in a primary or election in Georgia, and that he or she does not have any other form of identification that is acceptable under Code Section 21–2–417 for identification at the polls in order to vote; and

> (2) Who produces evidence that he or she is registered to vote in Georgia.

> This subsection shall not apply to a person who has been issued a driver's license in this state.

O.C.G.A. § 40–5–103(d).

8. The 2006 Photo ID Act also amended the text of O.C.G.A. § 21–2–417. O.C.G.A. § 21–2–417 currently provides:

> (a) Except as provided in subsection (c) of this Code section, each elector shall present proper identification to a poll worker at or prior to completion of a voter's certificate at any polling place and prior to such person's admission to the enclosed space at such polling place. Proper identification shall consist of any one of the following:

(1) A Georgia driver's license which was properly issued by the appropriate state agency;

(2) A valid Georgia voter identification card issued under Code Section 21-2-417.1 or other valid identification card issued by a branch, department, agency, or entity of the State of Georgia, any other state, or the United States authorized by law to issue personal identification, provided that such identification card contains a photograph of the elector;

(3) A valid United States passport;

(4) A valid employee identification card containing a photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state;

(5) A valid United States military identification card, provided that such identification card contains a photograph of the elector; or

(6) A valid tribal identification card containing a photograph of the elector.

(b) Except as provided in subsection (c) of this Code section, if an elector is unable to produce any of the items of identification listed in subsection (a) of this Code section, he or she shall be allowed to vote a provisional ballot pursuant to Code Section 21-2-418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in subsection (a) of this Code section within the time period for verifying provisional ballots pursuant to Code Section 21-2-419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

(c) An elector who registered to vote by mail, but did not comply with subsection (c) of Code Section 21-2-200, and who votes for the first time in this state shall present to the poll workers either one of the forms of identification listed in subsection (a) of this Code section or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector. If such elector does not have any of the forms of identification listed in this subsection, such elector may vote a provisional ballot pursuant to Code Section 21-2-418 upon swearing or affirming that the elector is the person identified in the elector's voter certificate. Such provisional ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in this subsection within the time period for verifying provisional ballots pursuant to Code Section 21-2-419. Falsely swearing or affirming such statement under oath shall be punishable as a felony, and the penalty shall be distinctly set forth on the face of the statement.

O.C.G.A. § 21-2-417.

9. The 2006 Photo ID Act also added O.C.G.A. § 21-2-417.1, which provides:

(a) Each county board of registrars shall provide at least one place in the county at which it shall accept applications for and issue Georgia voter identification cards to registered Georgia electors which shall under state law be valid only for purposes of voter identification under Code Section 21-2-417 and available only to registered electors of this state. No fee shall be charged or collected for the application for or issu-

ance of a Georgia voter identification card.

(b) No person shall be eligible for a Georgia voter identification card if such person has a valid unexpired driver's license or identification card issued under Code Section 40-5-100.

(c) The Georgia voter identification card shall be captioned 'GEORGIA VOTER IDENTIFICATION CARD' and shall contain a prominent statement that under Georgia law it is valid only as identification for voting purposes. The Georgia voter identification card shall be laminated, shall contain a digital photograph of the applicant, and shall include the following information:

(1) Full legal name;

(2) Address of residence;

(3) Birth date;

(4) Date identification card was issued;

(5) Sex;

(6) Height;

(7) Weight;

(8) Eye Color;

(9) County where the identification card was issued including a county number to be assigned for each county by the Secretary of State; and

(10) Such other information or identification as required by rule of the State Election Board.

(d) The application for a Georgia voter identification card shall elicit the information required under subsection (c) of this Code section and such other information as may be required by rule of the State Election Board. The application shall be signed and sworn to by the applicant and any falsification or fraud in the making of the application shall constitute a felony offense under Code Section 16-10-71, relating to the offense of false swearing.

(e) The board of registrars shall require presentation and verification of the fol-lowing information before issuing a Georgia voter identification card to a person:

(1) A photo identity document, except that a nonphoto identity document is acceptable if it includes both the person's full legal name and date of birth;

(2) Documentation showing the person's date of birth;

(3) Evidence that the person is registered to vote in this state; and

(4) Documentation showing the person's name and address of principal residence.

(f) A Georgia voter identification card shall remain valid so long as a person resides at the same address and remains qualified to vote. It shall be the duty of a person who moves his or her residence within the State of Georgia to surrender his or her card to the board of registrars of the county of his or her residence; and such person may after such surrender apply for and receive a new card if such person is otherwise eligible under this Code section. It shall be the duty of a person who moves his or her residence outside the State of Georgia or who ceases to be qualified to vote to surrender his or her card to the board of registrars by which it was issued.

(g) The State Election Board shall provide each county board of registrars with the necessary equipment, forms, supplies, and training for the production of the Georgia voter identification cards and shall maintain such equipment.

(h) The State Election Board shall adopt rules and regulations for the administration of this Code section and, without limiting the generality of the foregoing, such rules and regulations may further define or prescribe the

types of documentation required under subsection (e) of this Code section.

O.C.G.A. § 21–2–417.1.

10. On June 22, 2006, the State Board of Elections adopted rules and regulations to implement the 2006 Photo ID Act. The State submitted the rules and regulations to the DOJ for review, and the DOJ precleared the rules and regulations on June 27, 2006. The rules and regulations provide:

183–1–20.01 Georgia Voter Identification Card

(1) Intent and Purpose. These rules are promulgated pursuant to the authority granted the State Election Board under O.C.G.A. §§ 21–2–417.1 and 21–2–31. It is the intent of the State Election Board to provide for the time, place and manner in which each county Board of Registrars shall issue the Georgia Voter Identification Card to eligible electors and to provide for the acceptable types of documentation necessary to obtain a Georgia Voter Identification Card. To this end, the State Election Board has promulgated these rules and regulations.

(2) Application for the Georgia Voter Identification Card. Beginning with the July 18, 2006 Party Primary Election each county registrar shall provide the application for the Georgia Voter Identification Card in the form designed and published by the State Election Board or its member designee(s). Any registered voter who meets the criteria in O.C.G.A. § 21–2–417.1 and wishes to obtain a Georgia Voter Identification Card shall be required to submit the information requested in such application. It shall be the responsibility of each county registrar to ensure that each accepted application is complete.

(3) Availability of the Georgia Voter Identification Card

(a) Each county shall provide a place within the voter registrar's primary or main office location, as previously approved by the Department of Justice, to process applications for Georgia Voter Identification Cards and to process and distribute such cards.

(b) Each county registrar's office may provide additional locations or extended hours for processing applications for the Georgia Voter Identification Card and processing and distributing the cards but shall be required to comply with criteria for establishment of additional voter registration places as outlined in 183–1–6–.03(3).

(c) Each county registrar's office shall be open a minimum of eight hours per day on Monday through Friday of the week before the final primary, election, or run-off election day, except for legally observed holidays, and shall otherwise be open during normal business hours of the office in order to allow registered voters to apply for and obtain a Georgia Voter Identification Card.

(d) The voter registrar's office of each county shall provide the application and process the Georgia Voter Identification Card using the equipment, forms, supplies, and written training materials and/or verbal training provided by the State Election Board.

(e) Each county Board of Registrars shall sign and maintain an intergovernmental agreement provided by the State Election Board outlining the use of the equipment.

(4) Documentation required for application and issuance of the Georgia Voter Identification Card.

(a) In accordance with O.C.G.A. § 21–2–417.1(e), the Board of Registrars shall require the presentation and verification of the following information

before issuing a Georgia Voter Identification Card:

1. A photo identity document, except that nonphoto identity document is acceptable if it includes both the applicant's full legal name and date of birth;

2. Documentation showing the applicant's date of birth;

3. Evidence that the applicant is registered to vote in the State of Georgia, either by voter precinct card, a new voter registration application or confirmation of voter's record on the statewide voter registration system or by verifying the original application in the voter registrar's office; and

4. Documentation showing the applicant's name and principal residence address.

(b) In determining whether the requirements of O.C.G.A. § 21–2–417.1(e) have been met, the following shall apply:

1. Any of the following which contains a photograph of the applicant shall constitute a photo identity document, as provided in O.C.G.A. § 21–2–417.1(e)(1):

(i) Student ID Card including public or private high school, college, university, or vocational school;

(ii) Transit Card;

(iii) Pilot's License;

(iv) Nursing Home Identification Card;

(v) Employee Identification Card;

(vi) Government Housing Authority Identification Card;

(vii) Any government issued license;

(viii) Any card accepted by local, state or federal government for the provision of benefits; or

(ix) Any card accepted by local, state or federal government for access to buildings.

2. Any of the following shall constitute a nonphoto identity document in lieu of a photo identity document as provided in O.C.G.A. § 21–2–417.1(e)(1) only if it includes both the applicant's full legal name and date of birth:

(i) Original birth certificate or certified copy of birth certificate;

(ii) Certificate of birth registration;

(iii) Voter Registration Application;

(iv) Copy of records filed in court by the applicant or on behalf of the applicant by the applicant's counsel;

(v) Naturalization documents;

(vi) Copy of Marriage License Application;

(vii) A copy of the applicant's State or Federal Tax Return filed for the previous calendar year;

(viii) Any other document issued by local, state, or federal government so long as the document provides a reasonably reliable confirmation of the identity of the applicant;

(ix) Paycheck or paycheck stub bearing the imprinted name of the applicant's employer;

(x) An original of the annual social security statement received by the applicant for current or preceding calendar year;

(xi) An original of a Medicare or Medicaid statement received by the applicant;

(xii) Certified school record or transcript for current or preceding calendar year;

(xiii) Hospital birth certificate;

(xiv) An authenticated copy of a doctor's record of post-natal care; or

(xv) A federal Affidavit of Birth, form DS–10.

3. The registrar shall accept as documentation showing the applicant's date of birth under O.C.G.A. § 21–2–417.1(e)(2) any of the documents described in subparagraph (b)2 above.

4. The registrar shall accept as proof of voter registration under O.C.G.A. § 21–2–417.1(e)(3) the applicant's voter registration application or a voter's precinct card.

5. Any of the documents described in subparagraphs (b)(1) and (2) shall be acceptable as documentation showing the applicant's name and address of principal residence under O.C.G.A. § 21–2–417.1(e)(4) if the documentation contains the applicant's name and address of principal residence. In addition, the registrar shall also accept the following as documentation showing the applicant's name and address of principal residence if the applicant's name and address of principal residence appears on the document:

(i) Voter Precinct Card;

(ii) Utility or cable bill issued within the last sixty (60) days;

(iii) Bank statement issued within the last sixty (60) days;

(iv) Currently valid rental contracts and/or receipts for payments made within the last sixty (60) days for rent payments;

(v) A copy of the applicant's State or Federal income tax return filed for the preceding calendar year;

(vi) Homeowners insurance policy or bill for current or preceding calendar year;

(vii) Mortgage, payment coupon, deed, or property tax bill for current or preceding calendar year;

(viii) Current Automobile Registration Receipt;

(ix) Homestead Exemption documentation;

or

(x) W–2 for the preceding calendar year.

6. The application and supporting documentation of any applicant who is denied a Georgia Voter Identification Card shall be immediately forwarded via facsimile and U.S. mail to the State Election Board for automatic review to determine if the applicant has provided reasonably reliable documentary indicia confirming the identity of the applicant in which case the State Election Board shall direct the voter registrar to issue the Georgia Voter Identification Card.

## B. Individual Plaintiffs and Others Claiming Injury

### 1. Plaintiff Bertha B. Young

11. Plaintiff Bertha B. Young lives in Rome, Georgia. (Aug. 22, 2007, Trial Tr. at 8–9.)

12. Plaintiff Bertha B. Young is seventy-eight years old. (Aug. 22, 2007, Trial Tr. at 9.)

13. Plaintiff Bertha B. Young asserts that she has been registered to vote for the last fifteen to twenty years. (Aug. 22, 2007, Trial Tr. at 10.)

14. Plaintiff Bertha B. Young voted in the last presidential election. (Aug. 22, 2007, Trial Tr. at 10) Plaintiff Bertha B. Young does not know how many times she has voted. (*Id.*)

15. Plaintiff Bertha B. Young's regular polling place is approximately one block from her home, and she can walk to it. (Aug. 22, 2007, Trial Tr. at 10, 19) Alternatively, Plaintiff Bertha B. Young can obtain a ride from her sons or a friend to the polling place. (*Id.* at 13.)

16. Plaintiff Bertha B. Young has no driver's license or passport, and has not served in the military or as a state, city, or county employee. (Aug. 24, 2007, Trial Tr. at 10–11.) Plaintiff Bertha B. Young has a

photo identification card issued by the City of Rome Police Department approximately thirty years ago. (*Id.* at 11.) Plaintiff Bertha B. Young obtained that identification card to enable her to draw social security benefits after her husband died. (*Id.*)

17. Plaintiff Bertha B. Young has four children, one of whom lives in Rome, Georgia. (Aug. 22, 2007, Trial Tr. at 11–12, 15.)

18. Plaintiff Bertha B. Young had surgery on her right eye in March 2007, and needs surgery on her left eye. (Aug. 22, 2007, Trial Tr. at 12.) Plaintiff Bertha B. Young has difficulty in reading small print, as her eyes begin to water. (*Id.*)

19. Plaintiff Bertha B. Young does not drive; however, she rides a bus, takes a cab, or gets her sons to drive her. (Aug. 22, 2007, Trial Tr. at 12–13.) According to Plaintiff Bertha B. Young, her sons will take her anywhere she wants to go. (*Id.* at 15.) Plaintiff Bertha B. Young also has friends who will drive her places. (*Id.*) In fact, Plaintiff Bertha B. Young uses a bank that is across town from her residence, and her friends and family members drive her there. (*Id.* at 16–17.)

20. Plaintiff Bertha B. Young sometimes works two days per week; on those occasions, her employer, who is one of Plaintiffs' counsel, pays someone to give her a ride.[1] (Aug. 22, 2007, Trial Tr. at 14–15.)

21. Plaintiff Bertha B. Young does not have a Voter Identification Card ("Voter ID Card"). To obtain a Voter ID Card, Plaintiff Bertha Young could ride a bus to the registrar's office in downtown Rome, which is approximately two miles from her home. (Aug. 22, 2007, Trial Tr. at 13, 22.) According to Plaintiff Bertha B. Young, a bus trip from her home to the registrar's office would take her approximately one hour, and a trip home from the registrar's office would take her approximately another hour. (*Id.* at 13–14.) Plaintiff Bertha B. Young, however, testified that her son or a friend also could drive her. (*Id.* at 21.)

22. Plaintiff Bertha B. Young feels that she should not have to obtain a Voter ID card, as she uses her police identification card to cash checks. (Aug. 22, 2007, Trial Tr. at 14.) If the Court upholds the 2006 Photo ID Act, however, Plaintiff Bertha B. Young can and will obtain a Voter ID card. (*Id.* at 14–15, 23.)

23. Plaintiff Bertha B. Young received a letter from Secretary of State Handel during the week of August 13, 2007. (Aug. 22, 2007, Trial Tr. at 13, 21.) Plaintiff Bertha B. Young read some of the letter and could understand most of it. (*Id.*)

24. Plaintiff Bertha B. Young listens to the radio and watches television every day. (Aug. 22, 2007, Trial Tr. at 17.) Plaintiff Bertha B. Young also reads the local paper, the *Rome News–Tribune.* (*Id.*)

25. Plaintiff Bertha B. Young can read and write. (Aug. 22, 2007, Trial Tr. at 19.) Plaintiff Bertha B. Young also can sign her name and write her address. (*Id.*)

26. Plaintiff Bertha B. Young sends, receives, and reads mail. (Aug. 22, 2007, Trial Tr. at 19–20.)

27. Plaintiff Bertha B. Young understands that she could obtain an absentee ballot without giving a reason. (Aug. 22, 2007, Trial Tr. at 20.) Plaintiff Bertha B. Young has never voted absentee. (*Id.* at 20, 24.)

28. Plaintiffs' counsel asked Plaintiff Bertha B. Young to become involved in this lawsuit. (Aug. 22, 2007, Trial Tr. at 20.)

---

**1.** Plaintiff Bertha B. Young testified that she works for Attorney Edward Hine, Jr.'s family. (Aug. 22, 2007, Trial Tr. at 15.)

### 2. Plaintiff Eugene Taylor

29. Plaintiff Eugene Taylor resides in Screven County, Georgia. (Aug. 22, 2007, Trial Tr. at 52.)

30. Plaintiff Eugene Taylor traveled to Rome to testify at the bench trial. (Aug. 22, 2007, Trial Tr. at 52.) The trip took approximately four hours. (*Id.*)

31. Plaintiff Eugene Taylor quit school in the fifth grade because he had to help care for his siblings after his father died. (Aug. 22, 2007, Trial Tr. at 55–56.) Plaintiff Eugene Taylor testified that he reads a little, and that he can write his name, although writing is difficult. (*Id.* at 56.)

32. Plaintiff Eugene Taylor has never used a computer. (Aug. 22, 2007, Trial Tr. at 56.) Plaintiff Eugene Taylor watches television, and generally watches Augusta, Georgia, channels. (*Id.* at 56–57, 68.) Plaintiff Eugene Taylor also listens to a gospel radio program on Sunday mornings that is broadcast by a South Carolina radio station. (*Id.* at 57, 69.)

33. Plaintiff Eugene Taylor does not have a Photo ID. (Aug. 22, 2007, Trial Tr. at 57.)

34. Plaintiff Eugene Taylor does not drive. (Aug. 22, 2007, Trial Tr. at 57, 62.) Plaintiff Eugene Taylor's daughter takes him places if he needs to go somewhere. (*Id.* at 57, 63.) Plaintiff Eugene Taylor's daughter has a job. (*Id.* at 58.)

35. Plaintiff Eugene Taylor's daughter picks up his medicine and his groceries. (Aug. 22, 2007, Trial Tr. at 59.)

36. Plaintiff Eugene Taylor cashes checks at his bank, but does not need a Photo ID to cash those checks because the tellers know who he is. (Aug. 22, 2007, Trial Tr. at 58.)

37. Plaintiff Eugene Taylor works a couple of times a month on a farm. (Aug. 22, 2007, Trial Tr. at 67–68.) On those occasions, someone comes and gets Plaintiff Eugene Taylor and brings him home. (*Id.*)

38. Plaintiff Eugene Taylor is registered to vote, and he has voted. (Aug. 22, 2007, Trial Tr. at 59.) According to Plaintiff Eugene Taylor, he last voted in the 1980s. (*Id.* at 59, 65–66.) Plaintiff Eugene Taylor voted for the current Screven County sheriff, and, if the sheriff ran again, Plaintiff Eugene Taylor would vote for him. (*Id.* at 59.)

39. Plaintiff Eugene Taylor's polling place is at the senior citizen's center, which is approximately seven miles from his house. (Aug. 22, 2007, Trial Tr. at 60–61, 66.) The registrar's office, which is located at the county courthouse, is approximately the same distance from Plaintiff Eugene Taylor's house. (*Id.* at 67.)

40. Plaintiff Eugene Taylor has never voted by mail, and does not think he would do so. (Aug. 22, 2007, Trial Tr. at 62.) Plaintiff Eugene Taylor's daughter would help him vote by mail. (*Id.* at 74.)

41. Plaintiff Eugene Taylor is aware of the Photo ID requirement. (Aug. 22, 2007, Trial Tr. at 63.) If the Court upholds the Photo ID requirement, Plaintiff Eugene Taylor can obtain a Voter ID card by going to his local registrar's office. (*Id.* at 64.) Plaintiff Eugene Taylor's daughter will take him to the registrar's office, but she may need to take time off from work to do so. (*Id.*)

42. Plaintiff Eugene Taylor learned of this lawsuit through his grandson, who attended law school with one of Plaintiffs' counsel. (Aug. 22, 2007, Trial Tr. at 70.)[2] Plaintiff Eugene Taylor first learned of this case approximately two or three months ago. (*Id.*)

---

**2.** Plaintiff Eugene Taylor's grandson was a law school classmate of Jason Carter, one of Plaintiffs' attorneys. (Aug. 22, 2007, Trial Tr. at 70.)

43. In response to questioning from Plaintiffs' counsel, Plaintiff Eugene Taylor indicated that he had joined Plaintiff NAACP at some point. (Aug. 22, 2007, at 72–73.) Plaintiff Eugene Taylor does not remember when he joined Plaintiff NAACP, and could provide only vague details about joining Plaintiff NAACP. (*Id.*) Plaintiff Eugene Taylor failed to indicate whether he still is a member of Plaintiff NAACP. (*Id.*) The Court finds that this testimony is, at best, equivocal, and finds that Plaintiff Eugene Taylor's testimony on this issue was not credible. Consequently, the Court declines to accept any testimony by Plaintiff Eugene Taylor as to his membership in Plaintiff NAACP.

### 3. Declarations

44. Plaintiffs proffered the declarations of several Georgia voters who lacked Photo ID cards in connection with the 2005 and 2006 preliminary injunction hearings. The State Defendants objected to the Court's consideration of those declarations at trial, arguing that the declarations were hearsay. The Court agrees that the declarations, in general, are hearsay, and have not been rendered admissible by the parties.[3]

At trial, Plaintiffs proffered the declarations of Eleanor Whittenburg and Ruth White, who had passed away since proffering their declarations, arguing that those declarations met the requirements of Federal Rule of Evidence 803(b)(1) or Federal Rule of Evidence 807. The Court finds that the declarations of Ms. Whittenburg and Ms. White do not satisfy Rule 803(b)(1), as Defendants did not have an opportunity to develop the testimony contained in those declarations via cross-examination. The Court further finds that

those declarations do not meet the requirements of the residual exception of Rule 807, which should be used only in exceptional circumstances. The Court therefore does not consider the declarations of Ms. Whittenburg and Ms. White in connection with this Order.

### 4. Other Deponents

#### a. Annie L. Johnson

45. After the trial of the case, Plaintiffs submitted the deposition of Annie L. Johnson, who previously executed two declarations on behalf of Plaintiffs. (Docket Entry No. 225.) Ms. Johnson is seventy-seven years old and lives in Plains, Georgia. (Dep. of Annie L. Johnson at 5.) Ms. Johnson quit school in the sixth grade. (*Id.*) Ms. Johnson testified that she can read and write a little, or "[e]nough to get by." (*Id.* at 25.)

46. Ms. Johnson has anemia and must take protein shots each week or month. (A. Johnson Dep. at 6, 22.) Ms. Johnson also suffers from pain in her legs. (*Id.* at 6–7.)

47. Ms. Johnson's daughter lives in Terrell County. (A. Johnson Dep. at 21.) Ms. Johnson has a son who lives in Plains, whom she sees nearly every day. (*Id.* at 21–22.) Ms. Johnson's other son lives in Albany, Georgia. (*Id.* at 21.)

48. Ms. Johnson does not drive. (A. Johnson Dep. at 7.) Ms. Johnson's son and daughter drive her places, including driving her to her doctor's appointments. (*Id.* at 7, 21–22, 42.) According to Ms. Johnson, her son in Plains provides transportation to her wherever she needs to go. (*Id.* at 21–22.) That son does not have a vehicle, but will arrange to provide one if necessary. (*Id.* at 21–22, 42.)

---

**3.** Similarly, the declarations and affidavits of election officials submitted by the State Defendants in connection with the previous Motions for Preliminary Injunctions are hearsay, and the Court consequently has not considered those materials in connection with this Order.

49. Friends also drive Ms. Johnson. (A. Johnson Dep. at 7, 23, 42.) Ms. Johnson testified that sometimes she has to pay someone $5.00 or $10.00 to drive her places. (*Id.* at 43–44.) Ms. Johnson's son and daughter do not charge her for transportation. (*Id.* at 44.)

50. As far as Ms. Johnson is aware, Plains does not have a public transportation service. (*Id.* at 7, 22.) If Ms. Johnson needs to go somewhere, her friends or her family will take her. (*Id.* at 23.)

51. Ms. Johnson has never had a driver's license, or passport, or any other government identification other than a Social Security card. (A. Johnson Dep. at 8.) Ms. Johnson lost her social security card, and does not have a birth certificate. (*Id.*) Ms. Johnson does not have a government-issued Photo ID, and is not a government employee. (*Id.* at 9.)

52. According to Ms. Johnson, she is registered to vote. (A. Johnson Dep. at 9.) Ms. Johnson recalls voting for President Carter and in city elections. (*Id.* at 9–10, 17, 39.) Ms. Johnson testified that she last voted approximately two years ago, and that she voted in Americus, Georgia, on that occasion. (*Id.* at 10–11, 20.) Ms. Johnson testified that she believed she voted in Americus because there was a problem with the voting machines in Plains. (*Id.* at 11, 17.) A member of the city council transported Ms. Johnson and other people from Plains to Americus to vote via a van. (*Id.* at 11–12, 20.)

53. Ms. Johnson ordinarily would vote in Plains, and someone would transport her to the polls. (A. Johnson Dep. at 12, 21.) When Ms. Johnson votes in Plains, people generally know her. (*Id.* at 13.)

54. According to Ms. Johnson, her county registrar's office is located in the courthouse in Americus. (A. Johnson Dep. at 13.) Ms. Johnson also testified that the closest driver's license was somewhere in Americus. (*Id.* at 13.) Ms. Johnson goes to Americus at least once a month. (*Id.* at 13, 44.)

55. Ms. Johnson's husband voted absentee on one occasion. (A. Johnson Dep. at 14.) Ms. Johnson apparently assisted her husband in voting his absentee ballot. (*Id.* at 14, 18–19.)

56. Ms. Johnson prefers to vote in person. (A. Johnson Dep. at 14, 34.) When asked why she prefers to vote in person, Ms. Johnson testified:

> Well, I guess because one thing if the papers, you send them in the mail, they may get lost or I don't understand all the questions on it and I can't fill it out like I should. And if I come to vote I maybe don't have to do the writing. That's all. Nothing I got against it, just more convenience for me if I can get here to vote in person. It saves a lot of papers.

(*Id.* at 14.) Ms. Johnson testified that she does not wait until the day of the election to decide which candidate will receive her vote. (*Id.* at 15.) Ms. Johnson did not know that she could vote absentee by mail without presenting a Photo ID. (*Id.* at 35.)

57. Ms. Johnson does not have a computer, and does not use the Internet. (A. Johnson Dep. at 15.)

58. Ms. Johnson initially testified that she did not recall giving two declarations in this case. (A. Johnson Dep. at 25, 27.) Ms. Johnson later testified that "President Carter's deacon" came to her house with the statements, and she signed the statements. (*Id.* at 27–29, 37–38, 40, 45.) Ms. Johnson's testimony indicates that she did not fully understand what she was signing. (*Id.* at 38, 45–46.) [4]

---

**4.** Ms. Johnson apparently thought that she had done something wrong or was in trouble

59. Ms. Johnson does not believe that she should have to show a Photo ID to vote, because she has been voting without one for many years. (A. Johnson Dep. at 15, 26.) Ms. Johnson did not know that she could go to her registrar's office and get a free Voter ID card. (*Id.* at 31–32.)

60. Ms. Johnson testified that she knew she would be able to get a Voter ID card, and that she planned to go to Americus during either the week of her deposition or the following week. (A. Johnson Dep. at 31.) Ms. Johnson testified that she would not mind getting a Voter ID card if she did not have to have a birth certificate to obtain one and if the Voter ID card were free. (*Id.* at 32, 41.)

61. Ms. Johnson further stated that she did not think that it would be hard to get a Voter ID card. (A. Johnson Dep. at 33.) According to Ms. Johnson:

> If I can get the photo ID, I don't mind getting it. She told me I can get it and don't have to pay for it. I didn't know all the details of getting one and I do now. That's why I haven't gotten one. But since she says it's free, I will get one, pick up one as soon as I get over there.

(*Id.* at 41.)

### b. Larry Dewberry

62. Plaintiffs also filed the deposition of Larry Dewberry after the trial of this case concluded. (Docket Entry No. 224.) Mr. Dewberry lives in Fort Valley, Georgia, and is fifty-four years old. (Dep. of Larry Dewberry at 5.) Mr. Dewberry completed high school and attended, but did not complete, college. (*Id.* at 5–6, 13.)

63. Mr. Dewberry previously had a driver's license, but does not currently have one. (L. Dewberry Dep. at 7, 15–16.) Mr. Dewberry can drive, but does not drive. (*Id.* at 7.)

64. Mr. Dewberry has an expired military ID and an expired college ID. (L. Dewberry Dep. at 7, 18–19.)

65. Mr. Dewberry either walks places or has his brother or sister drive him places. (L. Dewberry Dep. at 8.) Mr. Dewberry's brother and sister previously have taken time off from work to drive Mr. Dewberry places. (*Id.* at 8.) Additionally, Mr. Dewberry's children give him rides. (*Id.* at 17.)

66. According to Mr. Dewberry, Fort Valley has vans that will transport people. (L. Dewberry Dep. at 10.) Mr. Dewberry believes the fee for the van ride is $2.00. (*Id.*)

67. Mr. Dewberry is registered to vote, and thinks he registered in the 1970s. (L. Dewberry Dep. at 8, 12, 20.) Mr. Dewberry also recalls registering to vote on May 4, 2006, at his local registrar's office. (*Id.* at 20–21, 28.) Some people from Atlanta took Mr. Dewberry to register to vote on that occasion. (*Id.* at 21–22.)

68. Mr. Dewberry is not certain when he last voted, but believes he last voted in 2005 or 2006. (L. Dewberry Dep. at 8–9, 22–23.) Ms. Dewberry rode with a lady named "Inez" or in cars provided by candidates to his polling place. (*Id.* at 9–10.)

69. The closest DDS service center to Mr. Dewberry's residence is in Perry, Georgia. (L. Dewberry Dep. at 10.) According to Mr. Dewberry, that DDS ser-

for signing the statements. A. Johnson Dep. at 33 ("So here I did wrong for signing this paper here? Is that what you're talking about?"), 34 ("I signed these papers wrong, is that what you mean?"), 38 ("And if I know it was wrong I never would have signed them."), 45 (expressing concern as to whether Ms. Johnson had done something wrong by signing the statements), 46 ("So I hope I didn't do wrong because I never been in trouble in my life.").

vice center is approximately ten to twelve miles from his residence. (*Id.* at 10–11.)

70. Mr. Dewberry's local registrar's office is approximately one-quarter of a mile from Mr. Dewberry's residence, and he can walk there in approximately seven to eight minutes (L. Dewberry Dep. at 17.)

71. Mr. Dewberry has never voted via absentee ballot. (L. Dewberry Dep. at 11, 34.) Mr. Dewberry testified that he prefers to vote in person, but stated that he did not know why. (*Id.* at 11.)

72. Mr. Dewberry further testified that he did not really think that people should be required to have Photo ID to vote, although "it could be good to have." (L. Dewberry Dep. at 12, 39.)

73. Mr. Dewberry now understands that he does not have to pay for a Voter ID card. (L. Dewberry Dep. at 29.) According to Mr. Dewberry, no one told him that he could go to his registrar's office and get a Voter ID card for free. (*Id.* at 32.) If Mr. Dewberry had known that information, he would have gotten a Voter ID card. (*Id.*) Mr. Dewberry plans to get a Voter ID card. (*Id.*)

74. Mr. Dewberry thought he needed a birth certificate to get a Voter ID card. (L. Dewberry Dep. at 35.)

75. Mr. Dewberry testified that it was not a hardship for him to walk to the registrar's office and get a Voter ID card. (L. Dewberry Dep. at 36.)

76. Mr. Dewberry signed two declarations for use in this case. (L. Dewberry Dep. at 24 & Exs. 1–2.) Mr. Dewberry contends that he had registered to vote before he signed the declarations. (*Id.* at 27.)

### C. Organizational Plaintiffs

77. Edward DuBose, who resides in Columbus, Georgia, serves as the state president for the Georgia State Conference of Plaintiff NAACP. (Aug. 22, 2007, Trial Tr. at 27, 29.) In that position, Mr. DuBose's responsibilities include overseeing all operations of Plaintiff NAACP's units in Georgia. (*Id.* at 29.)

78. Plaintiff NAACP's mission is to ensure political, educational, and economic equality for its members, as well as to eliminate racial discrimination and hatred. (Aug. 22, 2007, Trial Tr. at 29.) Plaintiff NAACP seeks to empower voters to go to the polls and to vote on issues. (*Id.*) To that end, Plaintiff NAACP is involved in voter registration, mobilization, and education. (*Id.* at 30.)

79. Plaintiff NAACP sets up voter registration drives across Georgia. (Aug. 22, 2007, Trial Tr. at 30.) At present, Plaintiff NAACP has fifteen to twenty voter registration drives scheduled throughout Georgia. (*Id.* at 31.)

80. Plaintiff NAACP's voter education efforts include attempting to inform voters concerning issues. (Aug. 22, 2007, Trial Tr. at 31.) To accomplish that goal, Plaintiff NAACP provides a political forum and literature, and grades politicians on issues important to Plaintiff NAACP's constituents. (*Id.*)

81. As part of Plaintiff NAACP's voter mobilization efforts, Plaintiff NAACP has undertaken initiatives to get voters to the polls that involve working with other organizations. (Aug. 22, 2007, Trial Tr. at 32.) Plaintiff NAACP uses churches and civic organizations to transport individuals to polls, and many of the individuals transported are elderly, disabled, or disadvantaged individuals. (*Id.*)

82. In 2004, Plaintiff NAACP spent $20,000 to $30,000 on its voter empowerment initiative. (Aug. 22, 2007, Trial Tr. at 32, 39.) Funds for that effort came from both local and national sources. (*Id.* at 39.) Plaintiff NAACP's national organization will attempt to examine voting laws

to determine which states need additional money. (*Id.* at 39–40.) In the past, Plaintiff NAACP's national organization has attempted to re-direct resources to other states with Photo ID requirements. (*Id.* at 40.) The reallocation could occur with any change in election law. (*Id.* at 40.) Alternatively, Plaintiff NAACP could encourage its members to vote by mail. (*Id.* at 49.)

83. Plaintiff NAACP generally uses volunteers to staff its voter empowerment initiatives, but it must use funds to purchase literature and set up forums. (Aug. 22, 2007, Trial Tr. at 32.)

84. Plaintiff NAACP is aware of the Photo ID requirement. (Aug. 22, 2007, Trial Tr. at 33.) Plaintiff NAACP generally uses its voter empowerment resources to maximize voter mobility and education. (*Id.*) If the Court sustains the Photo ID requirement, Plaintiff NAACP might have to redistribute its resources for voter education to help registered voters learn of the Photo ID requirements and to get voters in rural areas to obtain Photo ID cards. (*Id.*)

85. According to Mr. DuBose, some of the chapter presidents of the Georgia State Conference of Branches of Plaintiff NAACP informed him that at least five individuals would require assistance in obtaining a Photo ID card. (Aug. 22, 2007, Trial Tr. at 34.) Mr. DuBose, however, did not identify those individuals or specifically indicate whether those individuals actually were NAACP members. (*Id.*)

86. Mr. DuBose testified that the Photo ID requirement is an important issue for Plaintiff NAACP because the Photo ID requirement potentially affects Plaintiff NAACP's members, and because the Photo ID requirement potentially will affect the population that Plaintiff NAACP serves. (Aug. 22, 2007, Trial Tr. at 34.)

87. Mr. DuBose testified that Plaintiff NAACP educates voters who are physically unable to travel to the polls, and makes an effort to engage those voters in absentee voting. (Aug. 22, 2007, Trial Tr. at 37) Absentee voting in Georgia has become easier, as it now is "no-excuse" absentee voting. (*Id.*) Mr. DuBose, however, stated that many African–American voters, particularly elderly voters, are afraid of voting by mail, as they are concerned that their vote will not be counted. (*Id.* at 44–45.) According to Mr. DuBose, those voters have more reassurance that their votes will be counted if they vote in person. (*Id.*) Mr. DuBose further testified that some individuals are illiterate and will have problems using an absentee ballot; however, he also acknowledged that those individuals can get a family member to request an absentee ballot and to assist them in completing the ballot. (*Id.* at 46–47.) Although some individuals who need assistance in voting may be embarrassed to ask for assistance at the polls, voting by mail eliminates that particular embarrassment. (*Id.* at 47–48.)

## D. Voting Procedures, Changes in the Voting Laws, and Efforts to Inform Voters of Changes

### 1. Changes in Voting Laws and Concerns of Fraud

88. Prior to January 8, 2007, Cathy Cox served as Georgia's Secretary of State. (Oct. 12, 2005, Hr'g Tr. at 12.) During that same period, former Secretary of State Cox also served as the Chair of the State Election Board. (*Id.* at 13.) During the relevant period, the State Election Board consisted of five members, including former Secretary of State Cox, a representative from the Georgia Democratic Party, a representative from the Georgia Republican Party, a representative from the Georgia Senate, and a representative from the Georgia House of Representatives. (*Id.* at 13–14.) During her

tenure, former Secretary of State Cox served as the principal official in the State Government in charge of elections and for purposes of the Help America Vote Act of 2002 ("HAVA") and the National Voter Registration Act. (*Id.* at 14.)

89. During the ten years in which former Secretary of State Cox was affiliated with the Secretary of State's Office, that office received no reports of voter impersonation involving a scenario in which a voter appeared at the polls and voted as another person, and the actual person later appeared at the polls and attempted to vote as himself. (Oct. 12, 2005, Hr'g Tr. at 15–20; July 12, 2006, Hr'g Tr. at 10–11, 29.) Former Secretary of State Cox did not dispute that under the previous law, it was possible for the above voter impersonation scenario or another form of in-person voter fraud to occur. (Oct. 12, 2005, Hr'g Tr. at 15–20.)

90. Further, former Secretary of State Cox and her staff were not physically present in all 159 counties and the various municipalities on election days. (Oct. 12, 2005, Hr'g Tr. at 15–20; July 12, 2006, Hr'g Tr. at 30.) Secretary of State Cox therefore acknowledged that issues related to in-person voter fraud may have arisen and yet not been reported to her office. (Oct. 12, 2005, Hr'g Tr. at 15–20; July 12, 2006, Hr'g Tr. at 31.) According to former Secretary of State Cox, local election officials are in the best position to know of such incidents. (Oct. 12, 2005, Hr'g Tr. at 15–20.)

91. According to former Secretary of State Cox, during her tenure, the State Election Board received a number of complaints of irregularities with respect to absentee ballots. (Oct. 12, 2005, Hr'g Tr. at 15; July 12, 2006, Hr'g Tr. at 11.) In fact, former Secretary of State Cox recalled that the State Election Board discussed complaints of fraud and irregularities in absentee voting at most of the hearings she attended. (Oct. 12, 2005, Hr'g Tr. at 15.) A number of those complaints involved irregularities in collecting and returning absentee ballots, in which someone who was not authorized to collect or mail the absentee ballots did so for another voter. (Oct. 12, 2005, Hr'g Tr. at 15; July 12, 2006, Hr'g Tr. at 46.)

92. Former Secretary of State Cox also was aware of a previous incident in Dodge County, Georgia, involving vote buying and selling of absentee ballots. (Oct. 12, 2005, Hr'g Tr. at 18–19.) The Dodge County incident involved in-person absentee voting. (*Id.*)

93. During former Secretary of State Cox's tenure, Georgia had procedures and practices in place to detect voter fraud. (Oct. 12, 2005, Hr'g Tr. at 42.) Those procedures included verifying the voter's correct address, as well as the voter's name, during the check-in process for in-person voters. (*Id.*) Georgia also imposed criminal penalties for voter impersonation. (*Id.*) Most violations of Georgia election laws were punishable as felonies. (*Id.*) According to former Secretary of State Cox, no evidence indicated that the criminal penalties failed to deter in-person voter fraud sufficiently. (*Id.*)

94. According to former Secretary of State Cox, the integrity of the voter list also is extremely important in preventing voter fraud. (Oct. 12, 2005, Hr'g Tr. at 59.) Former Secretary of State Cox's office undertook an investigation in response to an article published in the *Atlanta Journal–Constitution* concerning fraudulent voting. (*Id.*) The investigation revealed that the specific instance of voter fraud outlined in the *Atlanta Journal–Constitution*, involving a report that Alan J. Mandel had voted after his death, actually did not occur. (*Id.* at 59–61.)

95. During former Secretary of State Cox's tenure, her office attempted to en-

sure that voter records were maintained and up to date. (Oct. 12, 2005, Hr'g Tr. at 62–63; July 12, 2006, Hr'g Tr. at 19.) Former Secretary of State Cox testified that, during her tenure, the Secretary of State's Office sent information concerning dead voters to local elections officials on a monthly basis, and had the authority to remove the names of deceased voters from the voter rolls if the local elections officials failed to do so in a timely manner. (Oct. 12, 2005, Hr'g Tr. at 62–63; July 12, 2006, Hr'g Tr. at 19) To former Secretary of State Cox's best knowledge, the procedures for removing dead voters were consistently followed during her tenure; however, former Secretary of State Cox could not vouch for what every individual county did. (July 12, 2006, Hr'g Tr. at 19.) Former Secretary of State Cox's office was authorized to remove only deceased voters from the voter registration list, and could not remove voters who are otherwise ineligible to vote. (*Id.* at 19–20.) Former Secretary of State Cox's office also relied on the counties to add voters who had newly registered to vote, and had no authority to add newly registered voters. (*Id.*)

96. Former Secretary of State Cox expressed concerns with respect to H.B. 244, noting that allowing individuals to vote absentee ballots without showing identification and removing the conditions previously required for obtaining absentee ballots opened a gaping opportunity for fraud. (October 12, 2005, Hr'g Tr. at 15–17.) Former Secretary of State Cox indicated that concerns with respect to absentee ballots involved incidents of individuals picking up absentee ballots for other individuals without the required family relationship and individuals removing absentee ballots from voters' mailboxes. (*Id.* at 17–19.) According to Secretary of State Cox, the only restrictions on absentee voting that tended to prevent fraud were the

restrictions for obtaining an absentee ballot. (*Id.*)

97. Former Secretary of State Cox also informed Governor Perdue that she believed the Photo ID requirement for in-person voting was unnecessary, created a significant obstacle to voting for many voters, was unlikely to receive preclearance from the Justice Department, violated the Georgia Constitution, and unduly burdened the fundamental right to vote. (Oct. 12, 2005, Hr'g Tr. at 21–22.) The opinion that former Secretary of State Cox expressed in her letter to Governor Purdue remained her personal opinion at the time of the preliminary injunction hearings; however, former Secretary of State Cox acknowledged that she was obligated to enforce and carry out the Photo ID requirement in her official capacity until the law is declared invalid. (*Id.* at 22.)

98. Former Secretary of State Cox also requested that Governor Perdue seek the opinion of Georgia's Attorney General before approving HB 244. (Oct. 12, 2005, Hr'g Tr. at 23.) Former Secretary of State Cox was not aware that Governor Perdue sought an opinion from Georgia's Attorney General concerning HB 244, and was not aware of any opinion issued by Georgia's Attorney General concerning the Photo ID requirement. (*Id.* at 23–24.)

99. Former Secretary of State Cox was aware of efforts to submit fraudulent voter registrations. (Oct. 12, 2005, Hr'g Tr. at 25.) Those efforts occurred both before and after Georgia enacted its Photo ID requirement. (*Id.*)

100. According to former Secretary of State Cox, at the time of the preliminary injunction hearings, Georgia had no requirement that a person seeking to register to vote present a Photo ID. (Oct. 12, 2005, Hr'g Tr. at 25–26.) Indeed, HB 244 did not address voter registration. (*Id.*)

101. Former Secretary of State Cox testified that HB 244 expanded the opportunity for voters to obtain absentee ballots. (Oct. 12, 2005, Hr'g Tr. at 31; July 21, 2006, Hr'g Tr. at 43–44.) Prior to July 1, 2005, voters seeking to obtain absentee ballots had to aver that they met certain requirements. (Oct. 12, 2005, Hr'g Tr. at 31.) After July 1, 2005, those requirements no longer applied for purposes of obtaining absentee ballots. (*Id.*)

102. Former Secretary of State Cox opined that a number of Georgia voters are elderly, have no driver's licenses, and have no need for a state-issued Photo ID card other than for voting purposes. (Oct. 12, 2005, Hr'g Tr. at 43.) Further, according to former Secretary of State Cox, a number of Georgia voters who are elderly or have low incomes do not have automobiles or use mass transit, and would have difficulty obtaining a Photo ID to vote. (*Id.*)

103. On January 8, 2007, Karen C. Handel took office as Georgia's Secretary of State. (Aug. 22, 2007, Trial Tr. at 76.)

104. Secretary of State Handel had no role in drafting, advocating, or preparing the 2005 Photo ID Act, and has not spoken to individuals involved in those activities. (Aug. 22, 2007, Trial Tr. at 77.)

105. Similarly, Secretary of State Handel had no role in drafting, advocating, or preparing the 2006 Photo ID Act, and has not spoken to individuals involved in those activities. (Aug. 22, 2007, Trial Tr. at 77.)

106. Secretary of State Handel has no knowledge indicating that her office has received a complaint of in-person voter fraud during her tenure. (Aug. 22, 2007, Trial Tr. at 78.)

107. Secretary of State Handel pointed out that any such reports would not come to her personal attention, but rather would come to the attention of the Inspector General, who would investigate the complaint. (Aug. 22, 2007, Trial Tr. at 78; Aug. 24, 2007, Trial Tr. at 31–32.) After investigating the complaint, the Inspector General would bring the matter before the State Election Board. (Aug. 22, 2007, Trial Tr. at 78; Aug. 24, 2007, Trial Tr. at 31–32.) Secretary of State Handel does not learn the details of a complaint until the complaint actually comes before the State Elections Board. (Aug. 22, 2007, Trial Tr. at 78; Aug. 24, 2007, Trial Tr. at 31–32.)

108. Secretary of State Handel testified that her office does not physically update the voter registration rolls to reflect address changes and deaths. (Aug. 22, 2007, Trial Tr. at 79–81.)

109. Instead, Secretary of State Handel's office forwards any information that it receives concerning address changes and deaths to the counties, which in turn bear responsibility for making the changes. (Aug. 22, 2007, Trial Tr. at 79–81.)

110. Secretary of State Handel's office receives a report from the Department of Vital Statistics listing deaths that have occurred. (Aug. 22, 2007, Trial Tr. at 80–81.) Secretary of State Handel does not know how frequently her office receives that report. (*Id.* at 81.)

111. According to Secretary of State Handel, her office needs to be more systematic with respect to keeping the voter list updated. (Aug. 22, 2007, Trial Tr. at 81.)

112. Secretary of State Handel's office is working with another State association to attempt to develop technology that will enable Secretary of State Handel's office to manage the voter registration list and associated data better. (Aug. 22, 2007, Trial Tr. at 82.)

113. Secretary of State Handel did not know the date that the voter rolls last were purged to remove voters who had died. (Aug. 22, 2007, Trial Tr. at 81–83.)

## 2. In–Person Voting

114. Presently, elections officials do not compare signatures on voter certificates of in-person voters to signatures on voter registration cards. (Oct. 12, 2005, Hr'g Tr. at 34.)

115. The voter registration cards are not physically present at the polling places. (Oct. 12, 2005, Hr'g Tr. at 34.)

116. Former Secretary of State Cox testified that it would be possible to send voter registration cards to polling places, but that comparing signatures on voter certificates to signatures on voter registration cards for in-person voters would be time-consuming. (Oct. 12, 2005, Hr'g Tr. at 35.)

117. Similarly, current Secretary of State Handel observed that comparing voter signatures for in-person voters on election day would be a "very onerous process." (Aug. 22, 2007, Trial Tr. at 127.)

118. Although former Secretary of State Cox testified that her office discussed digitizing the signatures on voter education cards, her office did not pursue that option. (July 12, 2006, Hr'g Tr. at 57.)

119. Local elections officials for counties are connected to the Secretary of State's Office through a mainframe computer. (Oct. 12, 2005, Hr'g Tr. at 64, 72.) The Secretary of State's Office does not have that capacity for municipal elections officials; however, in many cases, county elections officials also manage elections for municipalities within their counties. (*Id.*)

120. An individual who votes in person but does not present a Photo ID may vote a provisional ballot. (Oct. 12, 2005, Hr'g Tr. at 82, 86.) Elections officials, however, will not count the provisional ballot unless the voter returns to the registrar's office within forty-eight hours and presents a Photo ID. (*Id.* at 82.)

121. Voters who vote in-person are required to sign a voter certificate certifying that the information provided on the certificate is true, under penalty of perjury. (Oct. 12, 2005, Hr'g Tr. at 34; July 12, 2006, Hr'g Tr. at 24–25; Aug. 22, 2007, Trial Tr. at 83, 85–86, 126.) Making a false statement on the certificate is a felony. (July 12, 2006, Hr'g Tr. at 24, 26; Aug. 22, 2007, Trial Tr. at 84, 86.)

122. The Georgia legislature recently amended the voting laws to increase the penalties for fraudulently casting an absentee ballot and for completing a voter certificate falsely to provide for a term of imprisonment of up to ten years. (Aug. 22, 2007, Trial Tr. at 84.)

123. A voter who presents a Photo ID, or any other form of identification, with an address that differs from the address on the voter's voter registration, may cast a vote, but must do so using a provisional ballot. (Aug. 22, 2007, Trial Tr. at 88–89.)

## 3. Absentee Voting in Georgia

124. To obtain an absentee ballot, a voter must send in a request to the local registrar providing his or her name, address, and an identifying number, or must appear in person at the registrar's office and provide such information. (Oct. 12, 2005, Hr'g Tr. at 31, 46; July 12, 2006, Hr'g Tr. at 42.) A voter wishing to apply for an absentee ballot, however, need not complete a particular form. (Oct. 12, 2005, Hr'g Tr. at 46; July 12, 2006, Hr'g Tr. at 42–43.)

125. Instead, a voter who desires an absentee ballot need only send a letter or piece of paper to his or her county registrar stating that the voter wants an absentee ballot and providing the voter's name and address. (July 12, 2006, Hr'g Tr. at 42–43, 47; Aug. 24, 2007, Trial Tr. at 29.) If the voter cannot complete such a letter or piece of paper himself, he may obtain

assistance from someone else. (July 12, 2006, Hr'g Tr. at 43, 59; Aug. 24, 2007, Trial Tr. at 29.)

126. Similarly, a voter may obtain assistance from someone else when completing an absentee ballot and placing it in the required inner and outer envelopes. (July 12, 2006, Hr'g Tr. at 43, 48–49.)

127. Local elections officials are supposed to compare the signature on an absentee ballot request to the signature on the voter's registration card. (Oct. 12, 2005, Hr'g Tr. at 32–33; Aug. 22, 2007, Trial Tr. at 93.) If the signatures match, the local elections officials will send an absentee ballot to the address listed on the voter's registration. (Oct. 12, 2005, Hr'g Tr. at 32–33.) A voter who wishes to vote an absentee ballot need not provide a Photo ID unless that voter registered by mail, did not provide identification, and is voting for the first time by absentee ballot. (*Id.* at 84–85.)

128. After receiving an absentee ballot, the voter must complete the ballot and return it to the registrar, either by hand-delivery to the registrar's office by the voter or certain relatives of the voter, or by mail. (Oct. 12, 2005, Hr'g Tr. at 46–47; Aug. 22, 2007, Trial Tr. at 127.) Even if an absentee ballot contains a postmark indicating that the voter mailed it on an earlier date, elections officials will not count the absentee ballot if the ballot is not received in the registrar's office by 7:00 p.m. on the day of the applicable election. (Oct. 12, 2005, Hr'g Tr. at 47; Aug. 22, 2007, Trial Tr. at 127.) Exceptions to this rule exist for voters who are members of the military or reside overseas. (Oct. 12, 2005, Hr'g Tr. at 47.)

129. An absentee ballot that arrives in the registrar's office should be returned in two envelopes—an inner blank "privacy" envelope and an outer envelope that contains an oath signed by the voter. (Oct. 12, 2005, Hr'g Tr. at 32.) Local elections officials compare the signature on the oath contained on the outer envelope to the signature on the voter's registration card to verify the voter's identity. (*Id.* at 32–33, 76; Aug. 22, 2005, Trial Tr. at 93.)

130. Former Secretary of State Cox testified that the signature verification procedure is the only safeguard currently in place in Georgia to prevent imposters from voting by using absentee ballots. (Oct. 12, 2005, Hr'g Tr. at 33.) The verification process is done manually. (*Id.*)

131. Absentee ballots are submitted to the local registrars' offices over a forty-day period. (Oct. 12, 2005, Hr'g Tr. at 33.) However, if fifty percent of voters decided to vote by absentee ballot in any given election, local elections officials would have a difficult time completing the necessary signature verifications. (July 12, 2006, Hr'g Tr. at 51.)

132. Once a voter returns an absentee ballot to the registrar's office, the voter cannot change that ballot. (Oct. 12, 2005, Hr'g Tr. at 50–51.) The voter, however, has the right to notify the registrar that the voter intends to cancel the absentee ballot and vote in person. (*Id.*)

### 4. The Data Matches

133. In June 2006, former Secretary of State Cox's office issued a press release indicating that over 600,000 voters lacked either a valid Georgia driver's license or a Photo ID card issued by DDS. (July 12, 2006, Hr'g Tr. at 12–14) Former Secretary of State Cox's office obtained that information from a data match that former Secretary of State Cox authorized. (*Id.* at 14.) To conduct the data match, former Secretary of State Cox's office provided DDS with a list of registered voters that former Secretary of State Cox's office maintained. (*Id.* at 14–15, 33–34; Aug. 23, 2007, Trial Tr. at 106–07.) DDS then compared the list of registered voters to its database of

individuals who had valid Georgia driver's licenses and Photo ID cards issued by DDS. (July 12, 2006, Hr'g Tr. at 15–17, 33–34; Aug. 23, 2007, Trial Tr. at 107–08.) DDS returned a list of over 600,000 individuals who appeared on the voter registration list and who appeared to lack either a valid Georgia driver's license or a DDS-issued Photo ID card. (July 12, 2006, Hr'g Tr. at 20–21; Aug. 23, 2007, Trial Tr. at 108.)

134. The list returned by DDS intended to match individuals by last name, date of birth and social security number. (July 12, 2006, Hr'g Tr. at 21.) Individuals whose social security numbers were not in the database appeared on the list as not having a valid Georgia driver's license or DDS-issued Photo ID card. (*Id.*)

135. According to former Secretary of State Cox, in ordering the data match, her office was not intending to inflate the numbers of voters who purportedly lacked a Georgia driver's license or Photo ID card. (July 12, 2006, Hr'g Tr. at 17.) Rather, her office was attempting to identify the smallest number of voters possible who lacked a Photo ID so that her office could do a direct mailing to advise those voters of the 2006 Photo ID Act's requirements. (*Id.*)

136. On June 23, 2006, former Secretary of State Cox's office issued another press release stating that the voters who purportedly lacked a Photo ID were disproportionately elderly or minority voters. (July 12, 2006, Hr'g Tr. at 18.) The numbers used for that press release came from the data match that former Secretary of State Cox's office ordered. (*Id.*)

137. Former Secretary of State Cox testified that she was not aware of other data available to her office or to the State that would provide more accurate information concerning the number of voters who lacked a Photo ID. (July 12, 2006, Hr'g Tr. at 17–18.)

138. Former Secretary of State Cox testified that she had learned of a "few dozen" inaccuracies in the data match list of voters. (July 12, 2006, Hr'g Tr. at 21, 35.) Former Secretary of State Cox, however, had no personal knowledge of the data match list's accuracy. (*Id.* at 21, 35–36.)

139. Former Secretary of State Cox did not know how many Georgia voters lack any acceptable form of Photo ID under the 2006 Photo ID Act. (July 12, 2006, Hr'g Tr. at 32–33, 38.) Specifically, her office did not match its list of registered voters to federal government databases, to databases of other state government agencies that issue identification cards, or to tribal identification lists. (*Id.* at 37–38.)

140. After the Court issued its July 14, 2006, Order enjoining the Photo ID requirement for the July 2006 primary elections, the State Election Board continued to work with DDS representatives to attempt to obtain a list of registered Georgia voters who appeared to lack either a Georgia driver's license or a Georgia Photo ID card issued by DDS. (Sept. 14, 2006, Hr'g Tr. at 26–28; Aug. 22, 2007, Trial Tr. at 134; Aug. 23, 2007, Trial Tr. at 109–110.)

141. In response to the State Election Board's request, the DDS eventually returned a list in August or September 2006 of 106,522 Georgia voters who purportedly lacked a Georgia driver's license or Georgia Photo ID card, and approximately 198,000 other voters who had previously had a Georgia driver's license that either had been canceled, revoked, suspended, or declared invalid. (Pls.' Ex. 22; Sept. 14, 2006, Hr'g Tr. at 30; Aug. 22, 2007, Trial Tr. at 134.)

142. DDS has over eleven million driver's records in its database. (Aug. 22, 2007, Trial Tr. at 135; Aug. 23, 2007, Trial Tr. at 101.)

143. DDS's database includes a number of expired driver's licenses, some with listed expiration dates occurring as early as 1900. (Aug. 22, 2007, Trial Tr. at 135, 138–39; Aug. 23, 2007, Trial Tr. at 104–05.) According to DDS information technology manager Loraine Piro, the earliest reliable expiration date listed in the DDS database likely is from the 1970s. (Aug. 22, 2007, Trial Tr. at 139.)

144. In June 2007, the Secretary of State's Office sent information to DDS and requested that DDS perform another data match. (Aug. 22, 2007, Trial Tr. at 104, 136–37; Aug. 23, 2007, Trial Tr. at 111.) In particular, the Secretary of State's Office sent 5,084,239 voter names to DDS, and requested that DDS use the same matching criteria and procedures as it used to create the August or September 2006 data match. (Aug. 22, 2007, Trial Tr. at 136–37; Aug. 23, 2007, Trial Tr. at 110–11.)

145. DDS ran another data match, and concluded that 4,568,919 of the individuals on the Secretary of State's list had a valid, current Georgia driver's license. (Aug. 22, 2007, Trial Tr. at 104–05; Aug. 23, 2007, Trial Tr. at 111–12; Pls. Ex. 98; State Defs.' Ex. 37.)

146. DDS, however, was unable to match 198,378 of the records provided by the Secretary of State. (Aug. 22, 2007, Trial Tr. at 104; Pls. Ex. 98; State Defs.' Ex. 37.)

147. DDS did not run other screens on the database to determine whether it could decrease the number of "no-match" voters. (Aug. 23, 2007, Trial Tr. at 104.)

148. The DDS data matches simply match the voter registration information to the DDS's own database, and do not indicate whether the voters have Photo ID cards issued by an agency other than DDS. (Aug. 23, 2007, Trial Tr. at 123.)

149. The Secretary of State's Office also provided DDS with information concerning 1,075,467 registered voters in twenty-two Georgia counties that intend to hold special elections in September 2007. (Aug. 22, 2007, Hr'g Tr. at 107, 137.)

150. DDS ran a data match comparing the Secretary of State's list of registered voters in the twenty-two counties with the DDS's own records. (Aug. 22, 2007, Hr'g Tr. at 107, 137, 155.)

151. DDS's data match indicated that, of the 1,075,467 registered voters from the twenty-two counties, 948,014 of the voters had valid Georgia driver's licenses, 792 of the voters had cancelled driver's licenses, fifty of the voters had canceled permits, ten of the voters had been denied licenses, eight voters had been disqualified, twenty-seven voters had been disqualified from holding a commercial driver's license ("CDL"), three voters were not licensed, 367 of the voters had revoked licenses, 13,389 of the voters had surrendered licenses; 10,295 of the voters had suspended licenses, and 51,707 of the voters had expired licenses or DDS-issued ID cards. (Pls.' Ex. 99; State Defs.' Ex. 38.) Of the 51,707 voters with expired DDS-issued documents, 6,961 of the voters had expired DDS-issued ID cards. (Pls.' Ex. 99; State Defs.' Ex. 38.) 49,054 voters appeared as "no matches" on the list, indicating that DDS could not match those voters' information to any record in DDS's database. (Aug. 22, 2007, Trial Tr. at 107, 155.)

152. After Secretary of State Handel's office learned that Berrien County, Georgia, also planned to hold elections on September 18, 2007, the office requested that the DDS run another data match for registered voters in Berrien County. (Aug. 22, 2007, Trial Tr. at 158.)

153. Although Secretary of State Handel's office has information pertaining to the race, gender, and age of voters, Secre-

tary of State Handel's office did not use the DDS data match to determine how many of the individuals appearing on the no-match lists are African–American or elderly. (Aug. 22, 2007, Trial Tr. at 119–20, 159.)

### 5. Attempts to Educate Voters

154. After the Photo ID requirement received preclearance from the Justice Department, Secretary of State Cox ensured that the Elections Division conducted necessary training, distributed necessary supplies, and did everything possible to ensure that the Photo ID requirement was carried out in every election, including the elections held on August 26, 2005, September 20, 2005, September 27, 2005, and November 8, 2005. (Oct. 12, 2005, Hr'g Tr.) The Elections Division also provided information to the public concerning the Photo ID requirement via the website for the Secretary of State's Office and through other public information efforts. (*Id.*)

155. The State Election Board has promulgated rules and regulations to enforce the 2006 Photo ID Act. (July 12, 2006, Hr'g Tr. at 38, 70.) To former Secretary of State Cox's knowledge, no copies of those rules and regulations have been mailed to any registered voters. (*Id.* at 38.) Former Secretary of State Cox testified that her office would mail copies of the rules and regulations to voters who requested copies. (*Id.*) Former Secretary of State Cox's office shared the rules and regulations with the county registrars. (*Id.*) Former Secretary of State Cox's office also posted the rules and regulations on its website. (*Id.*)

156. Before the State Election Board adopted the rules and regulations, it posted those rules and regulations for comment. (July 12, 2006, Hr'g Tr. at 39, 70.)

157. The State Election Board drafted a letter to give to voters who came to vote in-person during the July 18, 2006, primary election that described the requirements of the 2006 Photo ID Act and explained where to obtain a Voter ID card. (July 12, 2006, Hr'g Tr. at 71–72.) The State Election Board made that letter available to any organization that wished to distribute the letter; however, no testimony indicated that any organization had distributed the letter. (*Id.* at 76.)

158. The State Election Board received some comments concerning the content of the letter and its readability during the hearing in which the State Election Board approved the letter. (July 12, 2006, Hr'g Tr. at 115, 133–34.) The State Election Board did not ask a literacy expert to review the letter to determine whether the average Georgia voter can read and understand the letter. (*Id.*)

159. The letter to be provided to voters during the July 2006 primary instructed the voters that they could vote a provisional ballot if they lacked a Photo ID. (Pls.' Ex. 12.) The letter to be provided to voters at the polls during the July 2006 primary did not contain a statement informing voters who voted provisional ballots that they had to return with a Photo ID within forty-eight hours to have their provisional ballots counted. (*Id.*) Instead, the State intended to have poll workers give verbal instructions concerning the forty-eight hour requirement to voters who receive provisional ballots. (July 12, 2006, Hr'g Tr. at 134.)

160. Prior to the July 2006 primary, the State Election Board made information concerning the process and requirements for obtaining Voter ID cards available to local registrars, and placed that information on its website. (July 12, 2006, Hr'g Tr. at 72.)

161. Prior to the July 2006 primary, the State Election Board also used television and radio paid public service announcements ("PPSAs") to inform voters

of the Photo ID requirement and the process and locations for obtaining Voter ID cards. (July 12, 2006, Hr'g Tr. at 73–74.)

162. The television PPSAs that ran prior to the July 2006 primary elections were thirty-second advertisements that ran on channels that were members of the Georgia Association of Broadcasters. (July 12, 2006, Hr'g Tr. at 110–11.) The total number of Voter ID cards issued increased after the State Election Board began running its PPSAs. (*Id.*)

163. The radio PPSAs that ran prior to the July 2006 primary ran on the Clear Channel network, which consists of 115 radio stations in Georgia. (July 12, 2006, Hr'g Tr. at 110–11, 132–33.) The network has a total estimated listening population of 900,000, including individuals who reside in neighboring states. (*Id.* at 111.) Some of the radio PPSAs that ran prior to the July 2006 primary aired very early on Saturday and Sunday mornings. (*Id.*)

164. After the Court issued its July 14, 2006, Order, the State Election Board discontinued its voter education efforts with respect to the 2006 Photo ID Act. (Sept. 14, 2006, Hr'g Tr. at 24.)

165. On September 1, 2006, the State Election Board held a meeting that addressed, among other things, voter education efforts for the 2006 Photo ID Act. (Sept. 14, 2006, Hr'g Tr. at 30–31.)

166. At the September 1, 2006, meeting, the State Election Board approved a letter to be mailed to approximately 305,000 voters listed on the DDS match report created in August or September 2006. (Sept. 14, 2006, Hr'g Tr. at 31.)

167. On September 13, 2006, the State Election Board began to mail that letter directly to those 305,000 voters, mailing 30,000 letters each day. (Sept. 14, 2006, Hr'g Tr. at 32–33, 54–56.)

168. On or about September 13, 2006, the Elections Division of the Secretary of State's Office sent a memorandum to county registrars that attached the letter mailed to the voters and that requested that the registrars also distribute the letter. (Sept. 14, 2006, Hr'g Tr. at 36–37.)

169. In September 2006, the State Election Board also adopted a voter education program for the 2006 Photo ID Act. (Sept. 14, 2006, Hr'g Tr. at 33–34.) The plan called for the State Election Board to distribute the letter mailed to voters to counties, local civic groups, churches, and other interested groups for further distribution. (*Id.* at 35–36, 57.) The plan also called for the State Election Board to resume running the PPSAs, and to develop an e-mail list to distribute the letter mailed to voters. (*Id.* at 37–38.) The plan also called for the State Election Board to provide the list of voters who purportedly lack Georgia driver's licenses or Georgia Photo ID cards to local political parties and candidates, and to telephone the individuals on the list. (*Id.*) Finally, the plan called for the State Election Board to produce a brochure concerning the 2006 Photo ID Act's requirements, for distribution through the Elections Division of the Secretary of State's Office. (*Id.*)

170. The State Election Board placed information concerning the 2006 Photo ID Act's requirements on the Secretary of State's website, and individuals who visited that website could access information through a link. (Sept. 14, 2006, Hr'g Tr. at 39–40.)

171. Although the State Election Board developed a list of organizations to which it planned to distribute the letter to be mailed to certain voters in September 2006, and the letter that it planned to distribute at the polls in July 2006, it had not distributed the letters to those organizations as of September 14, 2006. (Sept. 14, 2006, Hr'g Tr. at 41–43, 48.)

172. Further, the State Election Board found that it lacked sufficient funding in September 2006, to telephone each of the approximately 305,000 Georgia voters who purportedly lacked a Georgia driver's license or Georgia Photo ID card. (Sept. 14, 2006, Hr'g Tr. at 43.)

173. The State Elections Board approved a brochure concerning the Photo ID requirement to be distributed by the Elections Division of the Secretary of State's Office; however, that brochure had not been distributed as of September 14, 2006. (Sept. 14, 2006, Hr'g Tr. at 43–44.)

174. On September 5, 2006, the State Election Board resumed running PPSAs on television stations. (Sept. 14, 2006, Hr'g Tr. at 37.)

175. On September 6, 2006, the State Election Board resumed running PPSAs on radio stations. (Sept. 14, 2006, Hr'g Tr. at 37–38, 60–61.) The PPSAs ran on the same radio stations on which the PPSAs aired before the July 2006 primary elections. (*Id.*)

176. In February 2007, Secretary of State Handel's office began discussing a plan to educate voters concerning the Photo ID requirement. (Aug. 23, 2007, Trial Tr. at 134.)

177. Secretary of State Handel's office eventually developed such an education plan. (State Defs.' Ex. 1; Aug. 22, 2007, Trial Tr. at 149; Aug. 23, 2007, Trial Tr. at 132.)

178. The education plan includes three phases: (1) July 2007 through September 2007, which will focus on the September 18, 2007, elections and educating the voters in the twenty-three counties affected by those elections; (2) September 2007 through November 2007, which will focus on educating voters in counties that are holding elections on November 6, 2007; and (3) November 2007 through February 2008, which will focus on educating voters across the state. (State Defs.' Ex. 1; Aug. 22, 2007, Trial Tr. at 149–50; Aug. 23, 2007, Trial Tr. at 135.)

179. Although Secretary of State Handel's office has demographic information about voters, including age, gender, and race information, Secretary of State Handel's office did not take that information into account in developing the education plan. (Aug. 22, 2007, Trial Tr. at 119–20, 159.) According to Secretary of State Handel, she intended to reach out to as many voters as possible. (*Id.* at 119–20.)

180. Robert Simms, Deputy Secretary of State, testified that the Secretary of State's Office will measure the success of its voter education plan, in part, by determining whether counties are able to conduct elections in a fair, efficient, and successful manner and whether the counties comply with applicable State laws. (Aug. 22, 2007, Trial Tr. at 145, 151–54; Aug. 23, 2007, Trial Tr. at 133.) Mr. Simms further testified that the Secretary of State's Office also will measure the success of its voter education plan by determining whether more people obtain Voter ID cards, vote absentee, or vote provisional ballots that are counted, and by determining whether voters who choose to participate in elections are able to do so. (Aug. 22, 2007, Trial Tr. at 152; Aug. 23, 2007, Trial Tr. at 133.)

181. Secretary of State Handel's office's budget for educating voters is $500,000 for fiscal year 2008, which runs from July 1, 2007, through June 30, 2008. (Aug. 22, 2007, Trial Tr. at 131.) As of August 24, 2007, Secretary of State Handel's office had spent between $123,000 and $125,000 on the Photo ID education effort. (Aug. 23, 2007, Trial Tr. at 150.)

182. Secretary of State Handel testified that she will have an opportunity in January 2008 to ask for additional voter education funds if her office determines

that such funds are necessary. (Aug. 22, 2007, Trial Tr. at 131; Aug. 24, 2007, Trial Tr. at 27.) At this point, Secretary of State Handel plans to request more voter education funds, and believes that her request will be granted. (Aug. 22, 2007, Trial Tr. at 131.) In the event that the request for additional funds is denied, or in the event that Secretary of State Handel's office uses all of the $500,000 funds prior to January 2008, Secretary of State Handel plans to adjust her budget to make funds available for the Photo ID education effort. (Aug. 24, 2007, Trial Tr. at 26.)

183. Secretary of State Handel's office developed a letter, dated August 8, 2007, to mail to the voters in the counties holding elections on September 18, 2007, who appeared on the DDS no match list. (Aug. 22, 2007, Trial Tr. at 106; State Defs.' Ex. 4; Pls.' Ex. 68.)

184. The August 8, 2007, letter states, in relevant part:

> Our records indicate that you are a registered voter who may not have a Driver's License or Photo ID card issued by the Georgia Department of Driver Services (DDS). As Georgia's Secretary of State, I would like to take this opportunity to provide you important information about voting procedures in Georgia. Georgia law requires registered voters to show photo identification when voting in person. This photo identification requirement applies to all September 18, 2007 Special Elections and all future elections. You are not required to include any identification when you vote absentee by mail.
>
> If you do not have a valid or expired, Driver's License or a Photo ID issued by Georgia DDS you can still use one of the following:
>
> • Any valid state or federal government issued Photo ID, including a free voter ID card issued by your county registrar or DDS

> • Valid U.S. passport
>
> • Valid employee photo ID from any branch, department, agency, or entity of the U.S. Government, Georgia, or any county, municipality, board, authority, or other entity of this state
>
> • Valid U.S. military photo ID
>
> • Valid tribal photo ID
>
> If you DO NOT have one of these forms of identification, you are eligible to receive a **FREE** Georgia voter identification card. To receive this voter identification card, please contact any DDS office or your county registrar's office . . .
>
> For more information, you can call 1(877)725–9797. Or, please visit our website at **www.GaPhotoID.com** or call our office at (404)656–2871.

(Pls.' Ex. 68 (emphasis in original); State Defs.' Ex. 4 (same).) The letters provide the address and phone number for the voter's county registrar's office. (Pls.' Ex. 68; State Defs.' Ex. 4.)

185. Secretary of State Handel's office did not have the August 8, 2007, letter reviewed by a literacy expert prior to mailing it. (Aug. 22, 2007, Trial Tr. at 162–63.)

186. Secretary of State Handel's office did not hire a literacy expert to examine the August 8, 2007, letter, partly because the office had only limited funds for the voter education initiative. (Aug. 23, 2007, Trial Tr.)

187. The August 8, 2007, letter originally was mailed to the voters in twenty-two counties who appeared on the DDS match as a no-match, as having a suspended, canceled, surrendered, or revoked license, or as being not licensed or denied a license. (Aug. 22, 2007, Trial Tr. at 108, 156–57; Aug. 23, 2007, Trial Tr. at 141–43.)

188. During the week of August 15, 2007, Secretary of State Handel's office

mailed the August 8, 2007, letter to voters in the twenty-two counties who appeared on the DDS match as having an expired DDS-issued Photo ID card; however, the letter was not mailed to voters in the twenty-two counties who appeared on the DDS match as having expired Georgia driver's licenses. (Aug. 22, 2007, Trial Tr. at 109–112; Aug. 23, 2007, Trial Tr. at 143.) An expired Georgia driver's license is an acceptable form of Photo ID for purposes of the 2006 Photo ID Act. (Aug. 22, 2007, Trial Tr. at 158; Aug. 23, 2007, Trial Tr. at 173.)

189. During the week of August 17 through August 20, 2007, Secretary of State Handel's office also sent a copy of the August 8, 2007, letter to Berrien County, Georgia, voters who appeared on a DDS data match run for that county as being a no-match, as having a suspended, canceled, surrendered, or revoked license, or as being not licensed or denied a license. (Aug. 22, 2007, Trial Tr. at 158; Aug. 23, 2007, Trial Tr. at 144–45.)

190. Secretary of State Handel's office has developed a brochure addressing the Photo ID requirement that the office plans to mail before the September 18, 2007, elections, to the voters who received the August 8, 2007, letter. (Aug. 22, 2007, Trial Tr. at 162.)

191. Secretary of State Handel's office did not have the brochure document reviewed by a literacy expert. (Aug. 22, 2007, Trial Tr. at 162.)

192. Secretary of State Handel's office also developed a postcard that the office plans to send to the voters who were sent the August 8, 2007, letter. (Aug. 23, 2007, Trial Tr. at 147–48; State Defs.' Ex. 13.) Secretary of State Handel's office plans to mail the postcards to voters during the week of September 3, 2007. (Aug. 23, 2007, Trial Tr. at 148.)

193. Further, Secretary of State Handel's office developed an updated Georgia Voter Information Guide that includes information concerning the Photo ID requirement. (State Defs.' Ex. 3; Aug. 23, 2007, Trial Tr. at 217–18.)

194. Secretary of State Handel's office also developed a flyer that includes information about the Photo ID requirement. (State Defs.' Ex. 14.) The flyer also is available in a poster format. (State Defs.' Ex. 15.)

195. Secretary of State Handel's office also plans to make automated telephone calls to the voters who were mailed the August 8, 2007, letter. (Aug. 23, 2007, Trial Tr. at 149.)

196. Secretary of State Handel's office also purchased paid radio advertisements concerning the Photo ID requirement for the weeks of August 13, August 20, and August 27, and contemplated purchasing radio advertisements for later weeks. (Aug. 22, 2007, Trial Tr. at 160, 174; Aug. 23, 2007, Trial Tr. at 158; State Defs.' Ex. 26.)

197. The paid radio advertisements have run, and are scheduled to run, on the Clear Channel Network, which includes certain traffic reports, as well as the Georgia News Network. (Aug. 22, 2007, Trial Tr. at 174–75; State Defs.' Ex. 26; Aug. 23, 2007, Trial Tr. at 158; Aug. 24, 2007, Trial Tr. at 11.) Secretary of State Handel's office chose the Clear Channel Network, in part, because that network already has a contract with the State of Georgia, and using the network would allow Secretary of State Handel's office to bypass the often-lengthy State procurement process. (Aug. 24, 2007, Trial Tr. at 11.)

198. The paid radio advertisements are concentrated to cover the area that includes twenty-two of the counties that are holding elections on September 18, 2007.

(Aug. 22, 2007, Trial Tr. at 174–75; Pls.' Ex. 117.)

199. Secretary of State Handel's office did not perform a demographic analysis of the listening audience for the radio stations that are to run the paid radio advertisements, and did not measure the audience of those radio stations within the areas of the twenty-three counties that are holding September 18, 2007, elections. (Aug. 22, 2007, Trial Tr. at 174–75.)

200. Secretary of State Handel's office had planned to run unpaid public service announcements ("PSAs") prior to the September 18, 2007, elections; however, no such PSAs had run as of the date of the trial. (Aug. 22, 2007, Trial Tr. at 180; Aug. 24, 2007, Trial Tr. at 10.)

201. Secretary of State Handel's office has not purchased television or billboard advertisements addressing the Photo ID requirement to run prior to September 18, 2007. (Aug. 22, 2007, Trial Tr. at 160; Aug. 24, 2007, Trial Tr. at 12.)

202. The voter education plan developed by Secretary of State Handel's office also includes asking nongovernmental organizations and chambers of commerce to partner with the office in getting information concerning the Photo ID requirement to voters. (Aug. 23, 2007, Trial Tr. at 153–54.)

203. Secretary of State Handel's office sent a letter requesting assistance in notifying voters about the Photo ID requirement to a number of non-governmental organizations in the twenty-three counties who are holding elections in September 2007. (Aug. 23, 2007, Trial Tr. at 150–52; State Defs.' Exs. 5–6.)

204. Secretary of State Handel's office has received responses to the letter sent to the non-governmental organizations that include requests for materials, and has provided materials to the requesters for distribution. (Aug. 23, 2007, Trial Tr. at 152, 155.) The materials included for distribution include the Voter ID brochure and flyer. (*Id.* at 152.)

205. Secretary of State Handel's office has provided the Voter ID brochure, the flyer, and the poster to the registrars for twenty-two of the counties that are holding September 18, 2007, elections, and will mail those materials to the registrars in other counties. (Aug. 23, 2007, Trial Tr. at 153; Aug. 24, 2007, Trial Tr. at 8.) Secretary of State Handel's office also has provided those materials to some registrars in person. (Aug. 23, 2007, Trial Tr. at 153.)

206. Secretary of State Handel's office also wrote a letter to the libraries located in the twenty-three counties that are holding September 18, 2007, elections. (Aug. 23, 2007, Trial Tr. at 154–55; State Defs.' Exs. 11–12.) Secretary of State Handel's office enclosed materials relating to the Photo ID requirement with those letters. (Aug. 23, 2007, Trial Tr. at 155; Aug. 24, 2007, Trial Tr. at 7.)

207. Secretary of State Handel's office requested that Governor Sonny Perdue also speak about the Photo ID requirement. (Aug. 23, 2007, Trial Tr. at 220.)

208. Secretary of State Handel's office also sent a letter to all of the members of the Georgia General Assembly who represent constituents in the twenty-three counties that plan to hold September 18, 2007, elections, requesting that those legislators assist in informing voters of the Photo ID requirement. (Aug. 23, 2007, Trial Tr. at 155–56, 220.)

209. The 2006 Photo ID Act also has been the subject of numerous newspaper articles and television news reports.

210. Additionally, Secretary of State Handel's office has written editorials and articles, which the office has provided to newspapers in the twenty-three counties that are holding September 18, 2007, elec-

tions. (Aug. 23, 2007, Trial Tr. at 168–70; Aug. 24, 2007, Trial Tr. at 13–14.)

211. Further, Secretary of State Handel's office contacted representatives from several utility companies, and requested that the utility companies include information about the Photo ID requirement in their bills. (Aug. 23, 2007, Trial Tr. at 156–57; State Defs.' Ex. 18.) SCANA, a gas marketer that operates throughout Georgia, has agreed to include that information on its bills. (Aug. 23, 2007, Trial Tr. at 157.)

212. Secretary of State Handel's office also created a website for the Voter ID requirement, www.gaphotoid.com. (Aug. 23, 2007, Trial Tr. at 159; Aug. 24, 2007, Trial Tr. at 12; State Defs.' Ex. 25.) That website contains information pertaining to the Photo ID requirement, and is accessible both directly by typing in the website address or via a link from the Secretary of State's webpage. (Aug. 23, 2007, Trial Tr. at 159; Aug. 24, 2007, Trial Tr. at 13.) The website began operating during the first week of August 2007. (Aug. 23, 2007, Trial Tr. at 161.)

213. Secretary of State Handel's office also presented information concerning the Photo ID requirement and the process for issuing Voter ID cards to the county registrars during a state-wide, mandatory registrar training held on August 13 through August 15, 2007. (Aug. 23, 2007, Trial Tr. at 161–62; Aug. 24, 2007, Trial Tr. at 15–19; State Defs.' Exs. 27, 29–30.) Additionally, Secretary of State Handel's office plans to hold additional training for registrars between September 2007 and December 2007, and to make on-line training available to registrars. (Aug. 23, 2007, Trial Tr. at 162.) The registrars, in turn, are responsible for training poll workers. (Aug. 23, 2007, Trial Tr. at 163.)

214. Secretary of State Handel also is scheduled to speak to voters concerning the Photo ID requirement prior to the September 18, 2007, elections. (Aug. 24, 2007, Trial Tr. at 14.) Secretary of State Handel's appearances prior to the September 18, 2007, elections primarily will target voters in the twenty-three counties that are holding the September elections. (*Id.*)

215. According to Secretary of State Handel, her office began distributing educational materials to voters at the optimal time—approximately six weeks prior to the September 18, 2007, elections—as the educational efforts will lead up to the September 18, 2007, elections and provide a sense of urgency. (Aug. 24, 2007, Trial Tr. at 46.)

### 6. Obtaining a Voter ID Card

216. The State purchased equipment to create Voter ID cards. (July 12, 2006, Hr'g Tr. at 67; Sept. 14, 2006, Hr'g Tr. at 46.) The State selected a vendor for the equipment, and the equipment was installed in all of Georgia's 159 counties. (July 12, 2006, Hr'g Tr. at 67.)

217. Registrars received training concerning the Voter ID card equipment during the Georgia Registrars Convention held in May 2006. (July 12, 2006, Hr'g Tr. at 67.) Twenty to thirty counties also requested, and received, individual training from the vendor of the equipment. (*Id.*)

218. Counties began issuing Voter ID cards during June or July 2006. (July 12, 2006, Hr'g Tr.) As of July 12, 2006, Georgia counties had issued a total of 420 Voter ID cards, 109 of which were issued by Atlanta metropolitan area counties. (*Id.*)

219. Counties issue a temporary Voter ID card to voters on the day that the voters appear to request the Voter ID card. (July 12, 2006, Hr'g Tr. at 68–69; Aug. 22, 2007, Trial Tr. at 122–23.) The temporary Voter ID cards are valid for forty-five days. (July 12, 2006, Hr'g Tr. at

68–69.) The vendor is responsible for mailing permanent Voter ID cards to the voters, and usually does so within three days after the voters request the cards. (*Id.*) The counties may issue an unlimited number of temporary Voter ID cards, and the counties have supplies of applications for the Voter ID cards. (*Id.* at 69.)

220. The State contracted with the vendor of the Voter ID card equipment for the vendor to provide 10,000 Voter ID cards. (July 12, 2006, Hr'g Tr. at 123.) The State's contract with the vendor, however, provides that the State may purchase additional Voter ID cards if necessary. (July 12, 2006, Hr'g Tr. at 123; Aug. 24, 2007, Trial Tr. at 31.) If the State needs to purchase additional Voter ID cards, Secretary of State Handel's office will pay for the purchase. (Aug. 24, 2007, Trial Tr. at 31.)

221. The State Election Board's rules and regulations specify the hours that registrars' offices must remain open. (Aug. 22, 2007, Trial Tr. at 114–15.) The rules and regulations specifically require that the registrars' offices remain open from eight a.m. to five p.m. on the Monday through Friday during the week prior to an election. (*Id.*) No provision exists requiring the offices to be open at night, on weekends, or on holidays. (*Id.* at 115.)

222. Under the State Election Board's rules and regulations, a voter may present his or her voter registration application as a form of identification in order to obtain a Voter ID card from a county registrar. (July 12, 2006, Hr'g Tr. at 23, 26–27.) To register to vote, an individual need not provide a social security number, and is not required to provide any other identifying documentation, including a Photo ID. (July 12, 2006, Hr'g Tr. at 23–24, 26–27; Aug. 22, 2007, Trial Tr. at 93, 96.) A voter thus could register to vote, provide his or her voter registration application to the registrar, and, once his or her voter regis-

tration application is accepted, obtain a Voter ID card, all without showing any other form of identifying information. (July 12, 2006, Hr'g Tr. at 23–24, 26–27; Aug. 22, 2007, Trial Tr. at 96.) In theory, a voter who registered fraudulently several years ago now may use his or her fraudulent voter registration application to obtain a Voter ID card, which he or she may use to vote in person. (July 12, 2006, Hr'g Tr. at 24, 27.)

223. A voter also may use other non-Photo ID documents to obtain a voter identification card. (July 12, 2006, Hr'g Tr.)

224. Former Secretary of State Cox testified that the process of obtaining a Voter ID card is an additional step that an individual must go through to vote in person. (July 12, 2006, Hr'g Tr. at 28.) To that extent, the Voter ID card process could serve as a deterrent to fraud. (*Id.*)

225. As of 5:00 p.m. on September 13, 2006, the State of Georgia had issued 953 Voter ID cards. (Sept. 14, 2006, Hr'g Tr. at 46.)

192. Through July 2007, the State of Georgia had issued 2,830 total Voter ID cards through the registrars' offices. (Aug. 22, 2007, Trial Tr. at 151.) Between August 1, 2007, and August 23, 2007, the State of Georgia issued 198 additional Voter ID cards through the registrars' offices. (Aug. 24, 2007, Trial Tr. at 21.)

### E. Expert Testimony

#### 1. Dr. Sheryl Gowen

The State Defendants moved to exclude Dr. Sheryl Gowen's expert testimony, arguing that Dr. Gowen was not qualified to offer that testimony, and that Dr. Gowen's opinions did not satisfy *Daubert's* relevance and reliability requirements. For the reasons stated in the Court's separate Order addressing the State Defendants'

Motion to Exclude Reports and Testimony of Plaintiffs' Experts, the Court agrees with the State Defendants that Dr. Gowen's opinions and testimony fail to satisfy *Daubert* and have little, if any, relevance to the issues before the Court. The Court therefore does not consider those opinions and testimony.

### 2. Dr. Trey Hood

The State Defendants also moved to exclude Dr. Trey Hood's expert testimony, arguing that Dr. Hood was not qualified to offer that testimony, and that Dr. Hood's opinions did not satisfy *Daubert's* relevance and reliability requirements. For the reasons stated in the Court's separate Order addressing the State Defendants' Motion to Exclude Reports and Testimony of Plaintiffs' Experts, the Court agrees with the State Defendants that Dr. Hood's opinions and testimony fail to satisfy *Daubert*, and, for the most part, are irrelevant to the issues before the Court. The Court therefore does not consider those opinions and testimony.

### III. Conclusions of Law

#### A. Standing

1. "Article III of the United States Constitution limits the power of federal courts to adjudicating actual 'cases' and 'controversies.'" *Nat'l Alliance for the Mentally Ill, St. Johns, Inc. v. Bd. of County Comm'rs of St. Johns County,* 376 F.3d 1292, 1294 (11th Cir.2004). "The most significant case-or-controversy doctrine is the requirement of standing." *Id.* "'In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Id.* (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

2. To satisfy the standing requirement, a party must show: (1) that he has suffered an injury in fact; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury "will be 'redressed by a favorable decision.'" *Bischoff v. Osceola County, Fla.,* 222 F.3d 874, 883 (11th Cir. 2000).

3. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). To possess standing, however, an organizational plaintiff must show that one of its constituents otherwise has standing to sue. *Doe v. Stincer,* 175 F.3d 879, 882 (11th Cir.1999); *see also Nat'l Alliance for the Mentally Ill,* 376 F.3d at 1296 (noting, with respect to organizational plaintiffs, that failure to identify injured constituent prevented organizational plaintiffs from asserting associational standing).

4. The party invoking federal jurisdiction bears the burden of showing that it has standing to assert its claim. *Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. Envtl. Prot. Agency,* 386 F.3d 1070, 1083 (11th Cir.2004). The party asserting that it has standing must support each element of the standing showing "'in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Bischoff,* 222 F.3d at 878). Thus, in connection with a motion to dismiss, a party may simply "provide 'general factual allegations of injury resulting from the defendant's conduct.'" *Id.* (quoting *Bischoff,* 222 F.3d at 878). Simi-

larly, in connection with a request for a preliminary injunction, a party's standing may be judged based on the allegations of the party's complaint. *Bischoff,* 222 F.3d at 882 n. 8 (citing *Church v. City of Huntsville,* 30 F.3d 1332, 1336 (11th Cir.1994)). At the summary judgment stage, however, a plaintiff may not simply rest on mere allegations, but instead " 'must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true.' " *Id.* (quoting *Bischoff,* 222 F.3d at 878).

5. Given the above standard, during the trial on the merits, the organizational Plaintiffs were required to come forth with evidence showing that they each had at least one member who otherwise would have standing to sue in his own right, or that the organizations had standing independent of their membership. *Stincer,* 175 F.3d at 882. As Plaintiffs acknowledged at trial, all of the organizational Plaintiffs except Plaintiff NAACP failed to make that showing. Consequently, the Court need only examine whether Plaintiff NAACP has presented sufficient evidence to establish that it has standing.

■ 6. Plaintiff NAACP first argues that it has standing to sue on behalf of its members. As the Court previously concluded, Plaintiff Eugene Taylor's testimony as to whether he is a member of Plaintiff NAACP is not credible. Plaintiff NAACP consequently cannot establish standing based on Plaintiff Eugene Taylor's membership.

7. Further, although Mr. DuBose testified that he was generally aware of at least five individuals who would be affected by the Photo ID requirement, Mr. DuBose did not provide the names of those individuals, or even indicate whether those individuals actually were members of Plaintiff NAACP. Mr. DuBose's testimony consequently does not satisfy Plaintiff NAACP's burden to identify a member who otherwise would have standing to sue in his or her own right. *Stincer,* 175 F.3d at 882. Consequently, Plaintiff NAACP does not have standing to sue based on an injury to its members. *See also Ind. Democratic Party v. Rokita,* 458 F.Supp.2d 775, 815–16 (S.D.Ind.2006), *aff'd,* 472 F.3d 949 (7th Cir.2007), *pet'n for cert. filed,* No. 07–25 (U.S. July 2, 2007) (finding organizational plaintiffs lacked standing to sue on behalf of members where organizational plaintiffs failed to identify single member who did not already possess required photo identification or have injury beyond mere offense at having to present photo identification in order to vote).

■ 8. Alternatively, Plaintiff NAACP argues that it has standing to sue in its own right, based on the possibility that it may have to re-allocate resources to educate its members concerning the Photo ID requirement and to ensure that its members who lack Photo ID cards obtain those. In support of this argument, Plaintiff NAACP cites to *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), and *Central Alabama Fair Housing Center, Inc. v. Lowder Realty Co.,* 236 F.3d 629 (11th Cir.2000). Both *Havens Realty* and *Central Alabama Fair Housing Center,* however, are Fair Housing Act cases, which involve special sets. of circumstances. *Rokita,* 458 F.Supp.2d at 815–16. Plaintiff NAACP simply has not demonstrated that the United States Court of Appeals for the Eleventh Circuit would extend the standing analysis applied in those Fair Housing Act cases outside the context of housing discrimination, and the Court therefore declines to do so here. *Id.*

9. Additionally, Plaintiff NAACP, like the organizational plaintiffs in *Rokita,* failed to show that it already has expended resources in connection with the Photo ID requirement, but instead simply presented

testimony indicating that at some undetermined time in the future, it may have "to divert unspecified resources to various outreach efforts." *Rokita*, 458 F.Supp.2d at 816. As the *Rokita* court noted, "[s]uch imprecise and speculative claims concerning potential future actions designed to combat speculative discrimination are a far cry from the kind of organizational expenditures found to convey standing in *Havens*." *Id.* The Court therefore declines to apply *Havens* and its progeny to conclude that Plaintiff NAACP has standing to sue in its own right.

10. Further, the Court finds that, like the organizational plaintiffs in *Rokita*, any injury that Plaintiff NAACP would suffer would be of its own making. *Rokita*, 458 F.Supp.2d at 816–17. Indeed, as the *Rokita* court noted:

[T]he claimed injury suffered by the Organization Plaintiffs is entirely of their own making since any future reallocation of resources would be initiated at the Organization Plaintiffs' sole and voluntary discretion. Such an optional programming decision does not confer Article III standing on a plaintiff. As the D.C. Circuit observed: "The diversion of resources ... might well harm the [plaintiff's] other programs, for money spent on testing is money that is not spent on other things. But this particular harm is self-inflicted; it results not from any actions taken by [defendant], but rather from the [plaintiff's] own budgetary choices."

*Id.* (quoting *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C.Cir.1994)).

11. Additionally, the Court agrees with the *Rokita* court that

[T]he interpretation of *Havens* proffered by [Plaintiff NAACP], if accepted, would completely eviscerate the standing doctrine. If an organization obtains standing merely by expending resources in response to a statute, then Article III standing could be obtained through nothing more than filing a lawsuit. Such an interpretation flies in the face of well-established standing principles. Indeed, "[a]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation."

*Rokita*, 458 F.Supp.2d at 817 (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990)). Consequently, the Court declines to find that Plaintiff NAACP has standing to pursue this case.

12. For the reasons discussed above, the Court finds that Plaintiff NAACP has failed to establish that it has standing to sue on behalf of its members, or that it has standing to sue in its own right. Consequently, Plaintiff NAACP may not pursue this lawsuit.

13. Additionally, for the following reasons, the Court finds that the individual Plaintiffs, Plaintiff Bertha B. Young and Plaintiff Eugene Taylor, also have failed to demonstrate that they have standing.

14. First, although Plaintiff Bertha B. Young lacks a Photo ID that is acceptable for purposes of the 2006 Photo ID Act, she testified unequivocally that she can and will obtain a Photo ID card from her local registrar if the Court upholds the Photo ID requirement. Plaintiff Bertha B. Young further testified that she can go to her registrar's office, which is approximately two miles away from her house, by taking a bus. Although Plaintiff Bertha B. Young contends that the bus ride would take approximately one hour, she also testified that her sons and friends often drive her places. Indeed, Plaintiff Bertha B. Young uses a bank across town, and her

friends or family members drive her there. Under those circumstances, the Court simply cannot find that requiring Plaintiff Bertha B. Young to obtain a Photo ID card will impose a significant burden on her, or that Plaintiff Bertha B. Young has shown, by a preponderance of the evidence, that she has suffered, or is in imminent danger of suffering, an injury in fact because of the 2006 Photo ID Act. In particular, Plaintiff Bertha B. Young has not shown that she has suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotation marks and citations omitted). Plaintiff Bertha B. Young therefore lacks standing to pursue this lawsuit.

■ 15. Similarly, Plaintiff Eugene Taylor testified that he has not voted since sometime in the 1980s, and that, if the Court upholds the Photo ID requirement, he can and will get a Photo ID card from his local registrar to allow him to vote. Plaintiff Eugene Taylor testified that his daughter will drive him to get the Photo ID card, and the evidence in the record indicates that Plaintiff Eugene Taylor's local registrar's office is approximately the same distance from Plaintiff Eugene Taylor's home as is his polling place. Consequently, the Court cannot find that Plaintiff Eugene Taylor is in danger of suffering "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (quotation marks and citations omitted). Further, although Plaintiff Eugene Taylor

contends that his daughter may have to take off time from work to take him to the registrar's office, Plaintiff Eugene Taylor has not demonstrated that he will suffer any harm from his daughter taking off from work, and he may not use any alleged injury to his daughter from missing work to support his own claim of standing. Plaintiff Eugene Taylor therefore lacks standing to pursue this action.

16. In sum, the Court finds that Plaintiffs have failed to prove, by a preponderance of the evidence, that they have standing to pursue this action. The Court therefore may not entertain this case. Consequently, the Court need not address Plaintiffs' substantive challenge to the 2006 Photo ID Act. In an abundance of caution, however, the Court will address the merits of that challenge.

## B. Undue Burden[5]

### 1. Standard for Obtaining a Permanent Injunction

■ 17. A court may grant a preliminary injunction "only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir.2004) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.2000)) (en banc) (per curiam). " 'The standard for a permanent injunction is essentially the same as for a preliminary injunction except that the

---

5. During closing arguments, Plaintiffs' counsel apparently contended that the 2006 Photo ID Act burdens voters' right to freedom of association. Plaintiffs, however, did not allege in their Second Amended Complaint that

the 2006 Photo ID Act violated the First Amendment or otherwise violated voters' right to freedom of association. Plaintiffs consequently may not assert such a claim at this time.

plaintiff must show actual success on the merits instead of a likelihood of success.'" *Id.* (quoting *Siegel,* 234 F.3d at 1213). Additionally, "most courts do not consider the public interest element in deciding whether to issue a permanent injunction." *Id.*

18. A plaintiff seeking to enjoin enforcement of a state statute bears a particularly heavy burden. "'[P]reliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts.'" *Bankwest, Inc. v. Baker,* 324 F.Supp.2d 1333, 1343 (N.D.Ga. 2004) (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990)).

## 2. Success on the Merits

19. The Supreme Court has made it clear that voting is a fundamental right, *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), under the Fourteenth Amendment in the context of equal protection, *Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 629, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).

20. Indeed, in *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Court observed:

No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room

for classification of people in a way that unnecessarily abridges this right.

376 U.S. at 17–18, 84 S.Ct. 526.

21. Similarly, in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Court stated:

Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

377 U.S. at 561–62, 84 S.Ct. 1362.

22. "[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

23. The equal right to vote, however, is not absolute. *Dunn,* 405 U.S. at 336, 92 S.Ct. 995.

24. Instead, states can impose voter qualifications and can regulate access to voting in other ways. *Dunn,* 405 U.S. at 336, 92 S.Ct. 995.

25. Under the United States Constitution, states may establish the time, place, and manner of holding elections for Senators and Representatives. U.S. Const. art. I, § 4, cl. 1.

26. The qualifications and access regulations established by the states, however, cannot unduly burden or abridge the right to vote. *Tashjian v. Republican Party,* 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) ("[T]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote.") (citing *Wesberry,* 376

U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481); *see also Dunn,* 405 U.S. at 359–60, 92 S.Ct. 995 (striking down Tennessee's durational residency voting requirement of one year in state and three months in county); *Beare v. Briscoe,* 498 F.2d 244, 247–48 (5th Cir.1974) (invalidating provisions of Texas Constitution and implementing statute requiring persons who wished to vote in any given year to register each year during registration period beginning on October 1 and ending on January 31 of following year) (per curiam). In particular, the Supreme Court has observed that wealth or the ability to pay a fee is not a valid qualification for voting. *Harper v. Va. State Bd. of Elections,* 383 U.S. 663, 666–68, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (citations omitted; footnote omitted).

27. A number of Supreme Court cases have set forth standards for determining whether a state statute or regulation concerning voting violates the Equal Protection clause.

28. In *Dunn,* the Supreme Court stated that a court must examine: "the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." *Dunn,* 405 U.S. at 335, 92 S.Ct. 995.

29. Another Supreme Court case indicates that the Court should " 'consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' " *Kramer,* 395 U.S. at 626, 89 S.Ct. 1886.

30. Those cases apply strict scrutiny when examining state statutes or regulations that limit the right to vote. *Kramer,* 395 U.S. at 627, 89 S.Ct. 1886 ("[I]f a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest."); *see also Hill v. Stone,* 421 U.S. 289, 298, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975) ("in an election of general interest, restrictions on the franchise of any character must meet a stringent test of justification").

31. In a more recent line of cases, the Supreme Court has not necessarily applied the strict scrutiny test automatically to regulations that relate to voting. *Burdick,* 504 U.S. at 433–34, 112 S.Ct. 2059; *Tashjian,* 479 U.S. at 213, 107 S.Ct. 544 (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)).

32. Indeed, the Supreme Court observed in *Burdick:*

Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently." Accordingly, the mere fact that a State's system "creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny."

Instead, ... a more flexible standard applies. A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the

State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's most important regulatory interests are generally sufficient to justify" the restrictions.

*Burdick*, 504 U.S. at 433–34, 112 S.Ct. 2059 (citations omitted).

33. The Court finds that the appropriate standard of review for evaluating the 2006 Photo ID Act is the *Burdick* sliding scale standard.

34. Under that standard, the Court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights," *Burdick*, 504 U.S. at 433–34, 112 S.Ct. 2059.

### a. The Asserted Injury

35. For the reasons discussed below, the Court finds that Plaintiffs simply have failed to prove that the character and magnitude of the asserted injury to the right to vote is significant. Although

Plaintiffs contended at the preliminary injunction hearings that many voters who do not have driver's licenses, passports, or other forms of photographic identification have no transportation to a voter registrar's office or DDS service center, have impairments that preclude them from waiting in often-lengthy lines to obtain Voter ID cards or Photo ID cards, or cannot travel to a registrar's office or a DDS service center during those locations' usual hours of operation because the voters do not have transportation available, Plaintiffs failed to produce admissible evidence to that effect at trial. Indeed, the two named Plaintiffs both testified that they could and would travel to their local registrars' office to obtain a Photo ID card if the Court upheld the 2006 Photo ID Act, and their testimony, contrary to Plaintiffs' arguments, did not establish that either of the two named Plaintiffs would suffer an undue burden from traveling to the local registrar's office to obtain a Photo ID card. In particular, although the two named Plaintiffs testified that their children would have to take time off from work to take them to the registrar's office, the testimony in the record demonstrates that the two named Plaintiffs' children regularly take the two named Plaintiffs places, and that transportation may be available from other sources, including rides from friends. Additionally, although Plaintiff Bertha B. Young stated that her bus ride to the registrar's office would take one hour each way, she also testified that her friends could drive her, and it appears from the record that her friends and employer regularly transport her.

Similarly, Mr. Dewberry testified that he could walk one-quarter of a mile to the registrar's office to obtain a Voter ID card, and stated that obtaining a Voter ID card would not be a significant hardship for him. Consequently, the Court cannot find

that the Photo ID requirement is unduly burdensome for Mr. Dewberry.

Likewise, Annie Johnson testified that she goes to Americus at least once a month, that her friends or family members drive her there, and that she would obtain a Voter ID card the next time she went to Americus. This testimony fails to support Plaintiffs' contention that requiring Ms. Johnson to obtain a Voter ID card would unduly burden her right to vote.

Further, although Plaintiffs contended at the preliminary injunction hearing that many voters who lack an acceptable Photo ID for in-person voting are elderly, infirm, or poor, and lack reliable transportation to a DDS service center or a county registrar's office, the evidence in the record fails to support that contention. Even if the Court accepted Dr. Hood's testimony indicating that a higher percentage of the individuals who appear on the DDS no-match lists are elderly, or are African–American or other minorities, the testimony in the record established that the large numbers reported on the DDS no-match list were far from reliable.[6] Additionally, as previously noted, Plaintiffs proffered precious little admissible evidence showing that voters who lacked Photo ID had no transportation to a DDS office or a county registrar's office. Further, even if a voter's name appears on a DDS no-match list, the voter still may have some other form of acceptable Photo ID, and neither Dr. Hood's analysis nor the DDS no-match list purported to address that issue. Plaintiffs thus simply have not satisfied their burden of proving that the 2006 Photo ID Act unduly burdens minority or elderly voters.

36. Although Plaintiffs argue that the State's education efforts are irrelevant to the question of whether the 2006 Photo ID Act unduly burdens voters, the Court finds this argument unpersuasive. The Court's earlier rulings on the preliminary injunction motions, which found that the Photo ID requirements in the 2006 Photo ID Act unduly burdened voters, hinged in large part on the fact that many of the voters who might lack a Photo ID had no real notice of the Photo ID requirement or of how to get a Photo ID or vote absentee. At the trial, however, the evidence revealed that the State made exceptional efforts to contact voters who potentially lacked a valid form of Photo ID issued by the DDS and who resided in the twenty-three counties that planned to hold September 18, 2007, elections, and to inform those voters of the availability of a Voter ID card, where to obtain additional information, and the possibility of voting absentee without a Photo ID.[7] The evidence in the record indicates that the State also provided information to voters in general by advertising on the Clear Channel radio network, and by partnering with libraries

---

**6.** The undersigned appeared on one of the no-match lists. (July 12, 2006, Hr'g Tr. at 78.)

**7.** Although Plaintiffs' counsel argued that the voter education materials provided by the State were misleading or did not provide sufficient information, the materials informed the voters of the Photo ID requirement for in-person voting, explained who was eligible for a free Voter ID card, invited voters to contact their local registrars or the Secretary of State for further information, provided a toll-free telephone number, and, in the August 8, 2007, letter, provided the address and telephone number for the voters' respective local registrar's offices. That information was sufficient to convey the necessary message to the voters.

Additionally, although Dr. Gowen opined that the Flesch–Kincaid readability score for the materials provided to the voters was so high that a large percentage of Georgia voters could not understand the materials, that testimony is irrelevant. As discussed in the Court's Order granting the State Defendants' Motion to Exclude, the materials as analyzed by Dr. Gowen differed in several significant respects from the materials as actually given to the voters.

and nongovernmental organizations. Additionally, the Photo ID requirement has been the subject of many news reports, editorials, and news articles. Under those circumstances, Plaintiffs are hard-pressed to show that voters in Georgia, in general, are not aware of the Photo ID requirement.

37. Additionally, individuals who do not have an acceptable Photo ID for in-person voting can obtain an absentee ballot and vote absentee by mail without providing an excuse. Although Plaintiffs contend that the average Georgia voter cannot read and understand the absentee ballot request form, there is no requirement that a voter complete that form. Instead, a voter need only write his name, address, and date of birth on a piece of paper, indicate in which election he wishes to vote absentee, and mail the piece of paper to his registrar. If he cannot do this, or if he cannot complete the absentee ballot request form, he can obtain assistance from a family member. Similarly, if the voter cannot read and complete the absentee ballot, a family member can help him. The State thus has not, as Plaintiffs contend, completely barred voters who lack Photo ID from voting.

38. The Court acknowledges that in its previous Orders addressing the preliminary injunction motions, it concluded that the Photo ID requirement severely burdened voters. It is important to note, however, that the preliminary injunction motions were made at an earlier stage of the litigation and were made under more relaxed evidentiary standards. Here, however, Plaintiffs must actually prove their contentions by a preponderance of the evidence, using evidence reduced to an admissible form. Plaintiffs have failed to do so here.

39. Additionally, the Orders on the preliminary injunction motions were written under factual backgrounds that differ significantly from the admissible evidence presented to the Court at trial. In the case of the 2005 Photo ID Act, voters had no alternative for obtaining a Photo ID except to go to the DDS service centers or the Glow Bus. The evidence at the time indicated that the Glow Bus ran only sporadically and could not have possibly traveled to all of Georgia's 159 counties in time for the relevant elections, and also indicated that the DDS service centers often had long lines and long wait times. Further, under the 2005 Photo ID Act, voters either had to pay for their Photo ID card to vote in-person or swear to an affidavit of indigency, perhaps falsely. Voters also might have been required to pay fees to obtain the documents necessary to obtain a Photo ID Card from DDS.

40. At the time of the July 12, 2006, and September 14, 2006, preliminary injunction hearings, the evidence indicated that the State had given voters a choice of obtaining a free DDS-issued Photo ID card for voting purposes or a free Voter ID card issued by their local registrars. Unfortunately, the evidence indicated that the State had begun voter education efforts only shortly prior to those hearings, and that the voter education efforts used by the State did not appear to be reasonably calculated to reach the voters who lacked Photo ID. The Court's primary concern in connection with those hearings was that voters likely would not have sufficient time to learn about the Photo ID requirement, to discover how to obtain a Photo ID, and to travel to their respective DDS service centers or registrar's offices to obtain a Photo ID. Under those circumstances, the Court found that the Photo ID requirement was likely to cause voters without Photo ID to refrain from voting, and, consequently, the Photo ID requirement was an undue burden on the right to vote.

41. Here, however, the State has undertaken a serious, concerted effort to notify voters who may lack Photo ID cards of the Photo ID requirement, to inform those voters of the availability of free DDS-issued Photo ID cards or free Voter ID cards, to instruct the voters concerning how to obtain the cards, and to advise the voters that they can vote absentee by mail without a Photo ID. Although the State's educational effort may not be as extensive as Plaintiffs would like, the evidence demonstrates that the educational effort is reasonably calculated to inform voters of the change in the law and to inform voters what action they need to take. Additionally, the State's educational effort began sufficiently early to afford most voters who lack a Photo ID a reasonable opportunity to obtain one. The Court therefore finds that the 2006 Photo ID Act does not significantly burden the right to vote.

42. Similarly, at the time of the previous hearings, the State had not publicized no-excuse absentee voting by mail as an alternative to voting in person with a Photo ID. By the time of the trial, however, the State has reached out to voters to explain the availability of that option.

43. Plaintiffs appear to argue that the requirement of obtaining a Photo ID, in and of itself, significantly burdens the right to vote. The Court finds this argument unpersuasive. Indeed,

> Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends."

*Rokita,* 458 F.Supp.2d at 821–22 (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)).

Plaintiffs simply have not presented sufficient admissible evidence to show that the Photo ID requirement *severely* burdens the right to vote. Indeed, as the court noted in *Rokita:*

> Despite apocalyptic assertions of wholesale voter disenfranchisement, Plaintiffs have produced not a single piece of evidence of any identifiable registered voter who would be prevented from voting pursuant to [the 2006 Photo ID Act] because of his or her inability to obtain the necessary photo identification. Similarly, Plaintiffs have failed to produce any evidence of any individual . . . who would undergo any appreciable hardship to obtain photo identification in order to be qualified to vote.

*Id.* at 822–23. Additionally, although Plaintiffs claim to know of people who claim that they lack Photo ID, Plaintiffs have failed to identify those individuals. *Id.* at 823. The failure to identify those individuals "is particularly acute" in light of Plaintiffs' contention that a large number of Georgia voters lack acceptable Photo ID. *Id.* Further, although Plaintiffs Eugene Taylor and Bertha B. Young and Mr. Dewberry and Ms. Johnson state that they prefer to vote in person rather than voting absentee by mail, "this abrogation of their personal preferences is not a cognizable injury or hardship." *Id.* at 823 n. 71. As the *Rokita* court noted, voters who lack Photo ID undoubtedly exist somewhere, but the fact that Plaintiffs, in spite of their efforts, have failed to uncover anyone "who can attest to the fact that he/she will be prevented from voting" provides significant support for a conclusion that the Photo ID requirement does not unduly burden the right to vote. *Id.* at 823. Consequently, the Court declines to apply a strict scrutiny analysis to Plaintiffs' contentions.

### b. State Interest

■ 44. The State and the State Defendants assert that the 2006 Photo ID Act's Photo ID requirement is designed to curb voting fraud. " 'A state indisputably has a compelling interest in preserving the integrity of its election process.' " *Purcell v. Gonzalez*, —— U.S. ——, ——, 127 S.Ct. 5, 7, 166 L.Ed.2d 1 (2006). As the Supreme Court has noted:

> Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."

*Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1972)).

### c. Extent to Which the State's Interest In Preventing Voter Fraud Makes It Necessary to Burden the Right to Vote

45. Finally, the Court must examine the extent to which the State's interest in preventing voter fraud makes it necessary to burden the right to vote. Plaintiffs argue that the 2006 Photo ID Act is not narrowly tailored to the State's proffered interest of preventing voter fraud because the State Defendants failed to show that

any incidents of in-person voter fraud had occurred.[8] Plaintiffs also argue that the State had a number of significantly less burdensome alternatives available to prevent in-person voting fraud, such as the voter identification requirements it previously used and numerous criminal statutes penalizing voter fraud, to discourage voters from fraudulently casting ballots or impersonating other voters. Those arguments, however, presuppose that the Court will apply a strict scrutiny analysis. Because the Court has concluded that the 2006 Photo ID Act does not unduly or significantly burden the right to vote, a strict scrutiny analysis is not appropriate.

■ 46. Rather, the appropriate inquiry is whether the Photo ID requirement is rationally related to the interest the State seeks to further—preventing fraud in voting. The Court finds that the Photo ID requirement is rationally related to that interest.[9] Although Plaintiffs may argue that no documented cases of in-person voter fraud exist in Georgia, "the State is not required to produce such documentation prior to enactment of a law." *Rokita*, 458 F.Supp.2d at 826.

47. Additionally, Plaintiffs complain that any real problem with voting fraud exists in the absentee voting area, and that the State has failed to take steps to address that problem. This argument, once again, presumes that the Court will apply a strict, or heightened, scrutiny analysis. In any event, it is clear that "the legislature has wide latitude in determining the problems it wishes to address and the

---

**8.** Although Plaintiffs contend that the State Defendants have not proffered admissible evidence as to the interest supporting the 2006 Photo ID Act, Plaintiffs actually bear the burden of proof in this case. In any event, the evidence in the record is sufficient to support a finding that the State Defendants introduced the 2006 Photo ID Act in an effort to prevent fraud in voting.

**9.** In a previous Order, the Court speculated that the Photo ID requirement probably was not even rationally related to the asserted justification of preventing voting fraud. That speculation, however, is not binding on the Court and, frankly, proved to be inaccurate.

manner in which it desires to address them." *Rokita,* 458 F.Supp.2d at 829. As the Supreme Court has noted:

> Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.

*Williamson v. Lee Optical of Okla.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

#### d. Summary

48. For the reasons discussed above, the Court finds that Plaintiffs have not demonstrated that the Photo ID requirement places an undue or significant burden on the right to vote. Additionally, Plaintiffs have failed to demonstrate that the Photo ID requirement is not reasonably related to the State's interest in preventing fraud in voting. For those reasons, the Court finds that Plaintiffs have failed to succeed on the merits of their claim that the 2006 Photo ID Act violates the Equal Protection Clause because it imposes an undue burden on the right to vote.

### 3. Irreparable Harm

■ For the reasons discussed *supra* Part III.B., Plaintiffs have failed to show that the 2006 Photo ID Act's Photo ID requirement unduly or significantly burdens the fundamental right to vote. Plaintiffs thus have failed to prove that they or other Georgia voters will suffer irreparable harm if the Court declines to enter a permanent injunction.

### C. Threatened Injury to Plaintiffs Weighed Against the Damage to the State

■ Next, the Court must weigh the threatened injury to Plaintiffs against the damage to the State caused by a permanent injunction. As noted above, Plaintiffs simply have failed to prove that the Photo ID requirement unduly or significantly burdens the right to vote. On the other hand, the State has a compelling interest in preventing fraud in voting, and entering a permanent injunction will greatly interfere with the State's chosen method of protecting that interest. This factor therefore counsels against entering a permanent injunction.

### D. Public Interest

■ As previously noted, most courts do not consider the public interest factor in determining whether a permanent injunction should issue. *Klay,* 376 F.3d at 1092. In any event, a permanent injunction would not serve the public interest. For the reasons discussed above, Plaintiffs simply have failed to prove that the Photo ID requirement unduly or significantly burdens the right to vote. On the other hand, preventing voter fraud serves the public interest by ensuring that those individuals who have registered properly to vote are allowed to vote and to have their votes counted in any given election. This factor therefore counsels against granting a permanent injunction.

### E. Summary

In sum, the factors for granting permanent injunctive relief do not weigh in favor of Plaintiffs. In particular, Plaintiffs have failed to prove actual success on the merits of their claim that the 2006 Photo ID Act's Photo ID requirement unduly burdens the right to vote. Plaintiffs also have failed to show that they will suffer irreparable

harm if the Court does not grant a permanent injunction, much less that any harm to Plaintiffs outweighs the harm to Defendants that would occur if the Court granted permanent injunctive relief. Additionally, entering a permanent injunction would not serve the public interest. For those reasons, the Court declines to enter a permanent injunction, and finds in favor of the State Defendants on Plaintiffs' undue burden claim.

## IV. Conclusion

ACCORDINGLY, the Court **DISMISSES** this case, and **DIRECTS** the Clerk to **CLOSE** this case. The Court **DIRECTS** the Clerk to enter judgment in favor of the State Defendants.